## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| **MONIQUE SARGENT,** *individually and on behalf of all those similarly situated,* ) ) ) ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. |
| ) | |
| **MAINEHEALTH,** ) | |
| ) | |
| Defendant ) | |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Monique Sargent, by and through the undersigned counsel, individually on her own behalf and on behalf of all those similarly situated, both known and unknown, hereby complains against Defendant MaineHealth as follows:

## INTRODUCTION

1.     This is a class action arising under the Federal Family Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA") and the Maine Family Medical Leave Requirements Law, 26 M.R.S. § 843 *et seq.* ("Maine FMLA").

2.     This class action challenges Defendant's unlawful interference with the rights of Plaintiff and all those similarly situated to take protected leave under the FMLA and Maine FMLA, as well as retaliation against Plaintiff and similarly situated employees of MaineHealth for attempting to take protected FMLA leave.

3.     Defendant MaineHealth, by implementing no-fault attendance policies and practices, has a systemic pattern of failing to comply with the FMLA and Maine

1

FMLA. MaineHealth routinely disciplines and discriminates against employees who have an urgent or unexpected need for intermittent FMLA, for which advanced approval is not possible. MaineHealth's practice is to look the other way and ignore information it receives about employees who call out sick, come in late, or need time off during a shift due to FMLA-covered reasons. Despite having notice of employees' need for paid time off ("PTO") or other leave that is protected under the FMLA, MaineHealth intentionally shirks its legal obligations to provide notice of rights and responsibilities, or to designate certain leave as qualified under the FMLA. MaineHealth puts the burden on employees to discuss their need for leave with Unum, which administers employee benefits for MaineHealth. By putting the burden on Unum and employees to figure out when leave is protected, MaineHealth utterly fails to fulfill its obligation as an employer to abide by federal regulations, the FMLA, and the Maine FMLA. MaineHealth's pervasive violations of the FMLA and Maine FMLA are woven into the fabric of the organization. MaineHealth's illegal policies and practices impact large numbers of employees across various organizational units, because MaineHealth's goal is to systemically deter employees from calling out sick or missing shifts for FMLA-covered reasons.

## THE PARTIES

4.     Plaintiff Monique Sargent ("Sargent") is an individual residing in the City of Biddeford, County of York, and State of Maine.

5.     Defendant MaineHealth is a Maine non-profit corporation and the largest healthcare organization in the State of Maine. MaineHealth is the parent

company of multiple integrated healthcare provider entities all operated under the "MaineHealth" umbrella.

6. NorDx is a subsidiary of MaineHealth that is duly authorized to do business in the State of Maine, operating human specimen laboratories in various locations, with its principal place of business and main campus located in Scarborough, Maine.

7. NorDx has facilities in Biddeford, Saco, and Kennebunk, as well as oncology offices in South Portland, Sanford, and Biddeford.

8. MaineHealth and NorDx each employ more than 500 employees.

9. At all times herein relevant, MaineHealth and NorDx were an integrated enterprise and/or joint employer of Plaintiff, because MaineHealth and NorDx shared common management, ownership, direction and control, administration of employee benefits, operations, employee health services, labor counsel, and human resources.

10. For example, a "MaineHealth System Employee" form indicates that Sargent's employee ID number was 50515, and she worked in the "SMHC Biddeford Specimen Mgmt" department of MaineHealth.

11. The "company" that employed Sargent is listed as "MaineHealth" in other internal documents as well, where Sargent's employee number was also "50515."

12.     MaineHealth's personnel action forms also show Sargent as being employee number 50515, working for MaineHealth in the "Biddeford" location and the department called "NDX Specimen Mgmt SMMC."

13.     In 2016 when she was hired to work for "NorDx," Sargent was asked to sign a "MaineHealth Confidentiality Agreement."

14.     Sargent's payroll records indicate that the company she worked for was "MaineHealth."

15.     The email address used by NorDx employees ended in "mmc.org."

16.     After MaineHealth/NorDx terminated Sargent's employment and challenged her right to collect unemployment benefits, the name of the employer on file with the Maine Department of Labor was "Maine Medical Center."

17.     The attendance policy applicable to Sargent when she worked for the NorDx division of MaineHealth was a MaineHealth policy.

18.     The code of conduct in place during Sargent's employment was issued by MaineHealth.

19.     The job description for Sargent's position as a "Phlebotomist II" was issued by MaineHealth, with "NorDx" listed as the facility where she worked.

20.     The evidence establishing that MaineHealth was Sargent's employer is common to all other similarly situated employees alleged to be part of this class.

21.     Plaintiff, along with the class she seeks to represent, was a non-exempt employee of MaineHealth whose hours and daily schedule were governed by MaineHealth's attendance and corrective action policies.

## JURISDICTION AND VENUE

22.     Venue is proper in this Court because the FMLA violations alleged herein occurred in York and Cumberland counties.

23.     The Court has federal question subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331.

## BACKGROUND FACTS RELATED TO MONIQUE SARGENT

24.     In May of 2016, Plaintiff Monique Sargent ("Sargent") began working for MaineHealth as a Phlebotomist in NorDx's oncology office located in Biddeford.

25.     MaineHealth and NorDx both have a longstanding pattern of retaliating against employees who request FMLA leave. Sargent previously worked for NorDx and needed FMLA and short-term disability leave for a medical condition. Within weeks of needing that medical leave in 2013, NorDx fabricated false, defamatory, and pretextual reasons to fire Sargent.

26.     MaineHealth has a history of interfering with healthcare employees' rights to take FMLA leave, and retaliating against those employees who successfully request leave.

27.     MaineHealth and NorDx rehired Sargent in 2016, which the company would not have done if the false accusations made against Sargent in 2013 had been true.

28.     By 2018, Sargent was eligible to take FMLA leave.

29.     Sargent needed time off to take her son to therapy and other medical appointments in late 2018. Toward the end of 2018, the elementary school called

Sargent because her son was having serious mental health issues that required immediate intervention. After Sargent got called into her son's school due to his mental health issues, she walked into her supervisor Irina Bachand's ("Bachand") office in tears. Bachand asked Sargent what was wrong. Sargent explained what was going on with her son and that she needed to leave immediately to meet with the school.

30.   From that point forward, Sargent had to take her son to counseling 2 or 3 times per week. NorDx knew about these appointments.

31.   NorDx employees, including team lead Christie Gerrish ("Gerrish") and her supervisor (Bachand), were aware of Sargent's need to take intermittent leave for her child's serious health condition. Despite this knowledge, NorDx failed to provide Sargent with any notice of her rights or responsibilities under the FMLA in late 2018.

32.   On January 5, 2019, Sargent requested 2 hours of PTO on January 22, 2019 for a doctor's appointment for her son.

33.   On January 3, 2019, Sargent requested "Early Lunch? Dr Appt for my son @ 1130, should only take about an hour" on February 3, 2019.

34.   On January 3, 2019, Sargent requested 4 hours of PTO on February 7, 2019, stating: "Dentist for my boys. Out at 12."

35.   In January of 2019, Gerrish's role as a team lead was to assist with scheduling issues if a phlebotomist who had been scheduled at a particular location called out.

36.     On January 18, 2019, Gerrish contacted Sargent at 7:30 am, a half hour before Sargent's scheduled shift in Biddeford was to begin. Gerrish contacted Sargent through Facebook messenger to ask if she could work in South Portland instead of Biddeford oncology that day.

37.     Sargent explained to Gerrish that her daughters had a cheering competition that day, so she would prefer not to go to South Portland because then she would miss the cheering competition in the afternoon. Gerrish told Sargent to report to the Biddeford office as scheduled and she would try to get another phlebotomist to cover South Portland.

38.     Bachand wrote Sargent up on January 29, 2019 for not reporting to South Portland on the 18th, even though Sargent had only been given 30 minutes' notice to report to work in a different location than where she was scheduled that day.

39.     A few days before Bachand wrote Sargent up, on January 25, 2019, Sargent requested 8 hours of PTO on February 7, 2019, stating: "I know I have Approved PTO for the 7th for 4 hours, but would it be possible to have the whole day off? We have 4 appts scheduled throughout the day for 3 kids."

40.     NorDx gives phlebotomists two weeks' advanced notice of the location where they are supposed to work on a given day. Bachand herself wrote in a message to Gerrish on January 24, 2019 about Sargent that: "we give two weeks [sic] notice on these things…if it's more you don't need her approval." This statement by Bachand establishes that less than two weeks' notice of a schedule change does require an

employee's pre-approval. Some employees have childcare or transportation issues that make last minute schedule changes impossible to accommodate. Therefore, an employee who cannot change her schedule at the last minute is not insubordinate, as Bachand wrote on Sargent's January 29, 2019 corrective action.

41.    Bachand also wrote on the bottom of the January 29, 2019 corrective action form, "We discussed the expectation of bringing up concerns and frustrations to leadership, not other coworkers. Irina addressed prior comments made on this topic and how they were not supportive of our company values and team expectations."

42.    MaineHealth's "company values and team expectations" are that phlebotomists should never request time off, even for FMLA or childcare related reasons, and phlebotomists are not allowed to say "no" when asked to change their schedule at the last minute.

43.    Although the above events occurred on January 18, 2019, Bachand did not write Sargent up with a corrective action until January 29, 2019. By then, Bachand had exchanged emails with Gerrish discussing the fact that Sargent could not cover an upcoming shift because she needed an hour off between 9:15 and 10:15 am for an appointment, which should have been protected by the FMLA.

44.    The timing of the above events gives rise to a strong inference of retaliation under the FMLA.

45.    The above events also establish that Bachand had notice of Sargent's need for medical leave, yet she never took steps to advise Sargent of her rights and responsibilities under the FMLA.

46.     The team lead who also knew of Sargent's need for FMLA leave, Christie Gerrish, was living with Sargent in January of 2019.

47.     On January 31, 2019, Sargent was at work when she received a phone call from her landlord asking if everything was ok because there was an ambulance in the driveway.

48.     Sargent returned from work in the early evening of January 31, 2019 to find that a horrifying scene had unfolded in her home involving Gerrish and her baby daughter. Gerrish's daughter was already in an ambulance when Sargent arrived. Sargent learned that Gerrish had found her baby daughter unresponsive in the home and tried to administer CPR on Sargent's kitchen table, which Sargent's children witnessed.

49.     As a result of these horrifying events, Sargent's children were severely traumatized. Gerrish's baby daughter died from SIDS on January 31, 2019. Police arrived to work up the scene and ensure that the baby's death was from natural causes. Meanwhile, Sargent's son was in a second ambulance at the scene because he experienced such severe trauma from the events that he had a massive panic attack.

50.     The entire evening of January 31, 2019 into February 1, 2019, Sargent and her whole family were up all night with Gerrish. Maine State Police as well as the Biddeford Police and first responders interviewed them and preserved evidence to make sure no foul play was involved in the baby's tragic death. During these events, Gerrish was hysterical; she cried nonstop until the next day.

51.     After being up all night dealing with this devastating trauma, Sargent was unable to attend work the morning of February 1, 2019. None of her children were physically or mentally capable of attending school on February 1st and it would not have been safe for Sargent to draw blood after being up all night dealing with the death of her friend and housemate's baby. Sargent therefore called out of work on February 1, 2019. NorDx did not consider this absence protected by the FMLA. Instead, NorDx cited the absence in a corrective action form disciplining Sargent for unexcused absences from work.

52.     Everyone who worked closely with Gerrish and Sargent at NorDx knew that Sargent and/or her children had witnessed the traumatic events described above on January 31 and February 1, 2019. Director of Human Resources Patricia Hazard sent an email to all SMMC Lab Staff, including Bachand, discussing a PTO donation for Gerrish due to the sudden and tragic death of her daughter. Sargent's colleague Kathy Messier suggested that a PTO donation be started for Sargent as well.

53.     The funeral for Gerrish's baby daughter occurred on February 5, 2019. Gerrish asked Sargent to attend the funeral, so Sargent emailed Bachand and others asking for coverage and bereavement leave. In addition to the baby's funeral, Sargent had to attend a memorial service later in the day on February 5, 2019 for her husband's grandmother.

54.     Sargent called out the day of the funeral on February 5, 2019 and requested bereavement leave. Bachand counted this as an unexcused absence and

10

included it in the same corrective action disciplining Sargent for missing work on February 1, 2019.

55.    The day after Gerrish's daughter's funeral, Sargent exchanged emails with Bachand putting her on notice that "I had to put in pto for tomorrow" due to appointments for her boys, one for therapy at 11 am and a dental appointment at 12:20 pm. Bachand asked Sargent what she needed for time off. Sargent asked if she could call to discuss but Bachand simply asked, "what time do you need to leave and what time will you be back." Sargent told Bachand that she needed to leave work at 10:15 and would return around 2pm.

56.    Meanwhile, Bachand started an investigation into Sargent's request for bereavement leave after the death of Gerrish's baby (February 1, 2019) and the day of the funeral (February 5, 2019).

57.    Under MaineHealth/NorDx's bereavement leave policy, the company recognizes "special circumstances that may require an employee's absence from work." Whether a bereavement leave absence is paid or charged against PTO "depends on the nature of the absence." Defendant defines bereavement leave as "leave granted to give employees time to arrange and attend funeral services for a member of their immediate family." Immediate family is defined to include "other relative living in the same household." Therefore, it was reasonable for Sargent to believe that the time off she needed in connection with the baby's death qualified as bereavement leave, since Gerrish was living in Sargent's home and her children called Sargent "auntie."

11

58.     On February 13, 2019, Sargent requested 3 hours of PTO on March 1, 2019 to take her daughter to the dentist.

59.     On February 13, 2019, Sargent requested 4 hours of PTO on March 21, 2019 for one of her children's orthodontist appointments.

60.     On February 14, 2019, Sargent notified Bachand that she fell bringing out her dog and hurt her shoulder and neck, so she may have difficulty doing blood draws at "weird angles" the next day. Despite receiving this information, Bachand took no steps to notify Sargent of her right to take intermittent FMLA leave.

61.     On February 25, 2019, Bachand asked Sargent to pick up an extra evening shift. Sargent responded that her boys were home sick and she needed to check on whether she would need to take them to the doctor.

62.     On March 7, 2019, Bachand asked Sargent to pick up extra shifts on the weekend. Sargent responded that she could not work extra shifts because she needed to spend time with her children, and the school emailed her "asking me why I haven't been with them as much the last few weeks."

63.     On March 11, 2019, Bachand asked Sargent to come meet with her during Sargent's lunch break, which should have been time away from work. Sargent responded by asking how long the meeting would take because she had a "sick boy at home" that she needed to check on. In response, Bachand demanded that they meet "another time . . . today though."

64.     Bachand gave Sargent a corrective action on March 11, 2019 related to the fact that she called out of work to attend Gerrish's baby's funeral service on

February 5, 2019. Bachand wrote that Sargent "reached out to the HR director to ask for the reason code to be changed to bereavement on account of her 'niece'. Upon investigation, it was found that Monique does not have any familial relation to the person." Bachand then accused Sargent of failing to act with honesty and transparency and violating the code of conduct by making "false and misleading statements" about her relationship to Gerrish's deceased baby. However, Gerrish was living in Sargent's home at the time of the baby's death, and Gerrish's children called Sargent "auntie."

65.    Two days later, on March 13, 2019, Bachand met with Sargent and gave her yet another corrective action form. This corrective action form disciplined Sargent for exceeding NorDx's attendance standard "by accruing 6 unscheduled absences in a rolling calendar year." Two of the six unscheduled absences (2/1/19 and 2/5/19) were related to the death of Gerrish's baby and should have been excused absences that did not result in discipline. In any event, there was no justification for Sargent being written up twice for an absence on February 5, 2019, when she attended Gerrish's baby's funeral.

66.    NorDx disciplined Sargent for missing work on February 1, 2019 and disciplined her twice for missing work on February 5, 2019. These egregious and callous instances of discipline accused Sargent of being a dishonest employee who had been "investigated" for lying to NorDx, even though the baby who died was a household member of Sargent's. Worse still, the baby's tragic death occurred in front of Sargent and/or her children, on their kitchen table. Under these circumstances,

NorDx's conduct was defamatory, outrageous, and so intentionally malicious as to justify an award of liquidated damages against MaineHealth for a willful violation of the FMLA and Maine FMLA.

67.     One of the unexcused absences on the March 13, 2019 corrective action form was dated November 8, 2018, when Sargent had to take her son to the emergency department at Southern Maine Healthcare. No record exists of Sargent obtaining advanced approval for PTO on this day, because it was an emergency. However, Sargent gave NorDx enough information about the absence to put the company on notice of her need for FMLA-protected leave.

68.     One of the instances of tardiness included in the March 13, 2019 corrective action was dated April 6, 2018, when Sargent was late to work because she had to bring her son to the doctor.

69.     The March 13, 2019 corrective action informed Sargent that: "If you or a family member has a serious health condition, you may qualify for FMLA."

70.     On March 18, 2019, Sargent called in to work that she was running late because she had to bring her son to the doctor's. NorDx has an absence log system that records messages entered by employees whenever someone calls out. The employee who took Sargent's call on March 18, 2019 was Scott Valliere, and the "reason" he recorded for Sargent's tardiness was: "Family & Medical Leave – Family – FML." This absence log entry was sent via email to Bachand and others, putting them on notice at least as of March 18, 2019 that Sargent had a need for intermittent FMLA leave.

71.     The next day, March 19, 2019, Sargent wrote an email to Bachand asking to change around her schedule to come in to work early and leave by 3:30 to attend a follow up appointment with her son's doctor at 4:00 pm. Ignoring this request for leave, Bachand asked Sargent to work in South Portland until 4 pm that day. Sargent repeated that she needed to take her son to the doctor by 4 pm, and Bachand asked: "Would 330 work?" Sargent again said no because: "I don't think 3:30 would be enough time to go from SoPo to the school here in Bidd, then to the appt." Bachand then asked: "What time would you need to leave?" and Sargent said 3:00 or 3:10 pm. Rather than treating this like a request for intermittent leave that was protected under the FMLA, Bachand wrote back: "Waiting on confirmation, but it's looking like it'll be okay." Sargent then responded in all caps, "THANK YOU THANK YOU THANK YOU!!!!!" As a matter of law, Sargent should not have had to ask repeatedly to leave early enough to bring a child to the doctor, and she should not have had to thank her supervisor emphatically just to get protected FMLA leave.

72.     On March 28, 2019, Sargent submitted a time off request for 4 hours of PTO on April 16, 2019 when her daughter was getting bottom braces put on.

73.     On March 28, 2019, Sargent submitted a time off request for 3 hours of PTO on May 7, 2019 when her daughter was getting top braces put on. She then changed her request to a full 8 hours of PTO for: "Physicals for my boys, and my daughter is getting her top braces put on."

74.     On March 28, 2019, Sargent submitted a time off request for a full 8 hours of PTO on April 30, 2019, when her daughter had two medical appointments.

75. In an email exchange between Bachand and Gerrish on April 2, 2019 discussing scheduling, Gerrish said: "Monique makes my brain want to explode" and Bachand responded, "agreed."

76. On April 25, 2019, Gerrish forwarded to Bachand an email between her and Sargent, where Sargent told Gerrish, "I cannot work Monday morning rounds." Gerrish told Bachand, "You called it," and then wrote "smh," which means "shake my head."

77. The very day after Monique said she could not work Monday morning rounds, Bachand met with her to tell her she was being relocated.

78. When Bachand recommended Sargent for termination, along with HR Partner Cassie Christie, HR Director Patricia Hazard asked if she was on any protected leave. HR responded that the "Unum login" was not working, but according to the "HR Solution center," Sargent was on intermittent FMLA leave between March and April 16, 2019.

79. Despite acknowledging that Sargent had previously been approved for intermittent FMLA leave, NorDx has no record that she was advised of her rights and responsibilities under the FMLA.

80. Throughout March of 2019, because of Sargent's repeated requests for FMLA-protected leave, NorDx began looking for ways to terminate her.

81. NorDx's efforts to terminate Sargent's employment intensified in April and May of 2019, during which time NorDx relocated her from the Biddeford

Oncology office to a Saco draw station, claiming that Sargent's decayed teeth were causing patient complaints in the oncology office.

82.    Sargent has filed another lawsuit against NorDx, not MaineHealth, alleging disability discrimination because of her teeth. That lawsuit also alleges NorDx regarded Sargent as disabled when the company transferred her to a different location and then fabricated reasons for her termination.

83.    This class action lawsuit arises under the FMLA and different facts related to Defendant's no fault attendance policy. This class action pleads in the alternative to Sargent's disability discrimination case against NorDx that MaineHealth retaliated against Sargent for requesting FMLA leave and also interfered with her right to take FMLA leave, ultimately leading to Sargent's termination from employment on May 15, 2019.

84.    NorDx's false accusations against Sargent grew more egregious in May of 2019 when MaineHealth created an anonymous complaint about Sargent. There is no record of an actual patient complaining about Sargent. MaineHealth's own internal complaint system contends that an oncology patient was upset when Sargent called to tell him she had changed locations and would be in Saco if he wanted to get blood drawn there. Even if Sargent made this call and the patient was in fact upset, at the time of these events it was part of Sargent's job to call oncology patients and remind them of lab appointments to ensure that chemo treatment was not delayed.

85.    Around the same time, Bachand falsely accused Sargent of HIPAA violations and accessing oncology patient charts after she was reassigned from the

Biddeford oncology office to the Saco draw station. In reality, however, Sargent only accessed these oncology patient charts because she was the only person who understood the oncology orders and what steps were needed to ensure that labs were processed before the patient came in for chemo. The phlebotomists who replaced Sargent in Biddeford (Michelle Rose, Alexandra Sanborn, and Jolene Philbrick) all called Sargent with questions about these patients and their lab orders. Sargent only accessed the patient charts in order to answer the questions being asked by her co-workers. In any event, NorDx phlebotomists are routinely required and scheduled to float between locations, as discussed above.

86.     Notwithstanding the above job-related reasons for Sargent to access the oncology patient charts, Bachand engaged in a campaign to defame and disparage Sargent, accusing her of HIPAA violations that could negatively impact her entire career. These accusations were pretextual and designed to cover up retaliation against Sargent for taking protected FMLA leave between January and May of 2019.

87.     As a result of NorDx's false and pretextual accusations against Sargent, MaineHealth approved her termination from employment effective May 15, 2019, citing a "Category 3 sanction" and a "Final Written Warning Privacy breach—due to a current Written Warning already in place." Sargent would not have been terminated under MaineHealth's progressive discipline policy but for the illegal FMLA violations cited above, one of which resulted in Sargent being written up twice for the same thing.

88.     Defendant's conduct amounted to a willful and knowing violation of Sargent's state and federally protected rights.

## FACTS COMMON TO THE CLASS

89.     MaineHealth maintains a no-fault attendance policy that applies to "all MaineHealth employees," which states that it is "imperative that employees attend work as required including so that adequate staff levels and adequate staff and operational support exists as necessary. Coworkers, managers and patients depend on consistent attendance by employees to meet this obligation. This policy details how absences and tardiness are counted for the purposes of maintaining excellent patient and customer service."

90.     In 2019, MaineHealth's attendance policy provided that: "Employees are required to report to work on time each day as scheduled to ensure that all MaineHealth is staffed adequately in all areas of operations to provide the high level of care expected by our patients and their families. Unplanned absences represent a significant disruption to operations and constitute a major factor in employee performance."

91.     MaineHealth's attendance policy also contained reporting requirements for unplanned absences, requiring employees to "follow the expectations of their department and manager for how to communicate they will not be at work, will be at work late and/or will need to leave work early, including where appropriate personally notifying their manager, or another person, as designated by the manager,

as early as possible before their shift begins, or prior to their departure from the workplace."

92.     Upon information and belief, MaineHealth's 2019 attendance policy was substantially similar to the policy in place between 2016 and 2019.

93.     Based on the above requirements of MaineHealth's attendance policy, the company maintained a culture and systemic practice whereby every manager of every department was made aware of the reason for an employee's unplanned absence from work. This systemic practice and obligation to inquire about why employees needed an unplanned absence from work directly conflicts with any defense by MaineHealth that it did not know when an employee's unplanned absence was protected by the FMLA.

94.     Under MaineHealth's attendance policy, "If an employee's use of unplanned absences is excessive or inappropriate, based on standards defined below, corrective action will be initiated by the manager. Five unexcused occurrences in a twelve (12)-month rolling calendar year are considered excessive and will be the basis for corrective action."

95.     MaineHealth's no-fault attendance policy does not distinguish between unplanned absences for an FMLA-related reason or for a non-FMLA related reason. Instead, all unplanned absences for which pre-approval is not obtained are considered an "occurrence."

96.     MaineHealth's attendance policy mentions "protected" leave but does not expressly exempt FMLA-protected unplanned absences from the definition of an "occurrence."

97.     MaineHealth's no-fault attendance policy also provides without exception that: "Any pattern of absence/tardiness observed over a period of time will be addressed with the employee as unacceptable absences."

98.     At the end of MaineHealth's no-fault attendance policy, the company claims that protected absences, including those that qualify under the FMLA, "will not be counted against an employee's attendance record." However, MaineHealth's company-wide practice is to include FMLA-protected unplanned absences in corrective actions as an "occurrence." MaineHealth then includes boilerplate language in employee corrective action forms stating: "The Standards of Conduct policy states that the [department] attendance standard is to have no more than 5 unscheduled absences in a 12 month rolling calendar year. Excessive absences negatively impact patient care and team member morale. If you or a family member has a serious health condition, you may qualify for FMLA."

99.     MaineHealth includes the foregoing language in corrective action forms even when managers are on notice that an employee's unplanned absence is for an FMLA-protected reason. MaineHealth's objective in including this boilerplate language is to make it appear as though the company complies with the FMLA, but the employee being disciplined has failed to take adequate steps to make the manager aware of the need for FMLA leave. However, this transparent attempt by

MaineHealth to avoid its obligation under the FMLA is not consistent with its own practice of requiring managers to learn the reason for every unplanned absence.

100.   MaineHealth's practice of ensuring that managers learn of the reason for each employee's unplanned absence means that MaineHealth has "acquire[d] knowledge that an employee's leave may be for an FMLA-qualifying reason," which triggers MaineHealth's obligation to "notify the employee of the employee's eligibility to take FMLA leave within five business days." 29 CFR § 825.300(b)(1).

101.   The notice that MaineHealth must provide employees when the company acquires knowledge that an employee's leave may be for an FMLA-qualifying reason "must state whether the employee is eligible for FMLA leave as defined in § 825.110." This Notice of Eligibility and Rights and Responsibilities form (WH-381) affirmatively requires MaineHealth to inform an employee whether he or she is eligible for FMLA leave.

102.   MaineHealth's policy and practice of ignoring knowledge that an unplanned absence is for an FMLA-protected reason violates multiple provisions of the FMLA and 29 CFR § 825.300.

103.   MaineHealth's policy and practice of including all unplanned absences as "occurrences" and simply reciting that an employee "may" qualify for FMLA violates multiple requirements found in 29 CFR § 825.300.

104.   MaineHealth has a policy and practice of ignoring its obligations to provide notice of rights and responsibilities under the FMLA to non-exempt, hourly employees working in various healthcare settings, under its no-fault attendance

policy. MaineHealth also ignores its obligations to obtain certification and then designate leave as FMLA-qualifying, all of which are required by 29 CFR § 825.300.

105.    MaineHealth attempts to pawn off its obligations under the FMLA and federal regulations by outsourcing notification, certification, and designation under the FMLA from HR to the employee health department and/or Unum. MaineHealth outsources this role to make it especially onerous and difficult for employees to obtain notice and designation of leave as FMLA-qualifying.

106.    MaineHealth's culture and systemic practice of outsourcing all FMLA-related obligations to Unum or putting the burden on employees to fulfill the employer's obligations under the FMLA, is intentionally designed to eliminate unplanned absences, as described in the no-fault attendance policy quoted above. MaineHealth would rather discipline, discourage, and interfere with an employee's rights to take protected leave than comply with the FMLA, because this practice reduces the number of unplanned absences MaineHealth must contend with. By reducing unplanned absences, even if its actions violate the FMLA, MaineHealth can get away with less robust staffing of each division and department that delivers patient care, which in turn saves the company money.

107.    MaineHealth's culture and systemic practice is to pressure employees to never have unplanned absences, even for protected reasons. Employees are intimidated into believing that an employee who needs intermittent or unplanned FMLA leave is negatively impacting patient care. In reality, however, MaineHealth's only concern is its own bottom line. If MaineHealth simply devoted more financial

resources to adequate staffing and fair employment practices, employees would be able to take the protected leave they are entitled to under Federal and State law and staffing would be less of a concern.

108.   MaineHealth's no-fault attendance policy is not designed to advance patient care, but instead to increase profits and salaries for top "CXO" level executives, whose salaries well exceed $1 million per year.

109.   Plaintiff seeks certification of this lawsuit as a class action in order to adjudicate the rights of Plaintiff and all others similarly situated, including past and current employees of MaineHealth, known and unknown, who suffered violations of the FMLA or Maine FMLA during the applicable statute of limitations, resulting in damages (hereinafter "the putative class").

110.   Plaintiff and the putative class seek damages including back pay, liquidated damages, lost employee benefits and promotions, unpaid suspensions, front pay, prejudgment interest, equitable and injunctive relief, and all other damages available to them.

111.   This action is brought as a class action under Fed. R. Civ. P. 23 because the putative class is so numerous that joinder of all class members is impracticable.

112.   Plaintiffs and members of the putative class have been equally affected by Defendant's illegal FMLA practices and policies as described above.

113.   MaineHealth employs roughly 22,000 people. Upon information and belief, more than half of those are employees whose hours of work and schedules are determined by management and fall under the no-fault attendance policy described

above. Upon information and belief, the putative class contains hundreds of past and current MaineHealth employees.

114.    Historically, MaineHealth employees, especially those currently employed, have been reluctant to raise individual claims for fear of retaliation or fear that bringing an individual claim against MaineHealth will hinder their professional prospects in the future.

115.    The issues involved in this lawsuit present common questions of law and fact, which predominate over any factual distinctions that may exist between members of the class. Defendant has applied its illegal attendance policies against Plaintiff and hundreds of putative class members on a systemic, company-wide basis that does not depend on any one employee's individual circumstances.

116.    Plaintiff's claims are typical of the claims of the putative class.

117.    Plaintiff and the putative class have a common interest, along with Defendant, in the subject matter of this lawsuit and the remedy sought.

118.    Plaintiff is able to fairly and adequately represent and protect the interests of the putative class.

119.    Plaintiff's counsel is experienced in FMLA litigation and class action lawsuits, such as this one.

120.    If individual actions were required to be brought by each current or past employee injured or affected by Defendant's illegal FMLA violations, the result would be a multiplicity of actions, creating a hardship on the putative class, the Court, and Defendant. Accordingly, a class action is an appropriate method for the fair and

efficient adjudication of this lawsuit and distribution of a common fund of damages to which Plaintiff and the putative class are entitled.

## COUNT I – FMLA INTERFERENCE
### (29 U.S.C. § 2615(a)(1))

121.    Plaintiff and members of the putative class repeat the allegations contained in Paragraphs 1 through 120 as if fully stated herein.

122.    Defendant is an employer within the meaning of the FMLA, employing at least 50 employees for each of 20 or more calendar weeks from 2016 to the present.

123.    As of March 2019, Sargent was eligible and qualified for leave under the FMLA.

124.    At all times herein relevant, members of the putative class were also "eligible employees" within the meaning of the FMLA.

125.    Defendant employed Plaintiff and members of the putative class for at least 1,250 hours of service during the 12-month period immediately preceding the need for FMLA-protected leave.

126.    Plaintiff and members of the putative class requested or put Defendant on actual notice of the need for FMLA-qualifying leave.

127.    At all times herein relevant and material, Plaintiff and members of the putative class suffered from their own serious health condition, or the serious health condition of a family member as defined by the FMLA.

128.    Sargent's child or children suffered from serious health conditions within the meaning of the FMLA.

129.   Sargent provided Defendant with appropriate notice of her need to take full and/or intermittent leave under the FMLA, but Defendant mostly ignored her need for FMLA leave.

130.   As alleged above, Defendant has a policy or practice of violating the FMLA and ignoring its responsibilities under the federal regulations implementing the FMLA.

131.   Defendant interfered with Sargent's substantive rights under the FMLA by denying, discouraging, or restraining her requests for intermittent leave, by discipling her for unplanned absences that should have been protected under the FMLA, and by failing to provide her with appropriate notice, certification, or designation of her rights and responsibilities under the FMLA.

132.   Defendant has similarly interfered with hundreds of putative class members' rights under the FMLA as set forth in Paragraph 131 above.

133.   Sargent did not get all the FMLA leave, including intermittent leave, to which she was entitled.

134.   Putative class members whose rights under the FMLA were restrained, interfered with, or discouraged did not take all the FMLA to which they were entitled because of Defendant's illegal policies and practices of violating the FMLA.

135.   As a result of Defendant's FMLA interference, Sargent and the putative class have suffered and are entitled to damages, including but not limited to lost wages and lost employee benefits, front pay, attorney's fees, costs, and expenses.

136.    Defendant's violation of the FMLA was willful, justifying an award of liquidated damages under the FMLA.

137.    Plaintiff and the putative class are entitled to pre and post-judgment interest on all damages, costs, expenses, and fees from the date of filing this class action complaint.

WHEREFORE, Plaintiff Monique Sargent, individually on her own behalf as well as on behalf of all those similarly situated who are members of the putative class, requests that the Court award damages for Defendant's violation of the FMLA in the form of lost back pay, front pay, liquidated damages, attorney's fees, costs and expenses, equitable and injunctive relief as set forth below, and all other relief afforded to Plaintiff and the putative class by law.

## COUNT II – FMLA RETALIATION
### (29 U.S.C. § 2615(a)(2))

138.    Plaintiff and the putative class repeat the allegations contained in Paragraphs 1 through 137 as if fully stated herein.

139.    In addition to the allegations set forth above, Defendant discriminated against Sargent and members of the putative class by imposing discipline, making false and defamatory accusations, and in some instances terminating employment to punish employees for taking FMLA-protected leave.

140.    Defendant took adverse action against Sargent and other members of the putative class for exercising their rights under the FMLA.

141.    Defendant retaliated against Sargent and other members of the putative class for exercising their rights under the FMLA or for needing leave that was protected under the FMLA.

142.    Defendant's no-fault attendance policy violates multiple provisions of the FMLA, amounting to discrimination prohibited by the FMLA.

143.    As a result of Defendant's FMLA retaliation and discrimination, Sargent and members of the putative class have suffered and are entitled to damages, including but not limited to lost wages and benefits, back pay, front pay, attorney's fees, costs, and expenses.

144.    Defendant's violation of the FMLA was willful, justifying an award of liquidated damages under the FMLA.

WHEREFORE, Plaintiff Monique Sargent, individually on her own behalf as well as on behalf of all those similarly situated who are members of the putative class, requests that the Court award damages for Defendant's violation of the FMLA in the form of lost back pay, front pay, liquidated damages, attorney's fees, costs and expenses, equitable and injunctive relief as set forth below, and all other relief afforded to Plaintiff and the putative class by law.

## COUNT III – INTERFERENCE UNDER THE MAINE FMLA
### (26 M.R.S. § 847(1))

145.    Plaintiff and the putative class repeat the allegations contained in Paragraphs 1 through 144 as if fully stated herein.

146.    For all the reasons set forth in Count I above, Defendant has unlawfully interfered with, restrained, or denied the rights of Plaintiff and other members of the putative class in violation of the Maine Family Medical Leave Requirements Law.

147.    For Defendant's violation of the Maine FMLA, Plaintiff and members of the putative class are entitled to damages equal to the wages, salary, employment benefits or other compensation denied to or lost by Sargent and members of the putative class, as well as injunctive relief to enjoin MaineHealth's ongoing violations of the FMLA.

148.    Under the Maine FMLA, Plaintiff and the putative class are also entitled to liquidated damages of $100 per day for each day that the violation continued.

149.    Under the Maine FMLA, Plaintiff and the putative class are entitled to double damages for MaineHealth's willful violations of law.

WHEREFORE, Plaintiff Monique Sargent, individually on her own behalf as well as on behalf of all those similarly situated who are members of the putative class, requests that the Court award damages for Defendant's violation of the FMLA in the form of lost back pay, front pay, $100 per day penalties, liquidated damages, attorney's fees, costs and expenses, equitable and injunctive relief as set forth below, and all other relief afforded to Plaintiff and the putative class by law.

## COUNT IV – UNLAWFUL DISCRIMINATION UNDER THE MAINE FMLA
### (26 M.R.S. § 847(2))

150.    Plaintiff and the putative class repeat the allegations contained in Paragraphs 1 through 149 as if fully stated herein.

151.    For all the reasons set forth in Count II above, Defendant has unlawfully discriminated against Plaintiff and other members of the putative class in violation of the Maine Family Medical Leave Requirements Law, by discharging, fining, suspending, expelling, disciplining, or otherwise discriminating against Plaintiff and members of the putative class for exercising their rights under the Maine FMLA.

152.    For Defendant's discrimination in violation of the Maine FMLA, Plaintiff and members of the putative class are entitled to the damages set forth in Count III above.

WHEREFORE, Plaintiff Monique Sargent, individually on her own behalf as well as on behalf of all those similarly situated who are members of the putative class, requests that the Court award damages for Defendant's violation of the Maine FMLA in the form of lost back pay, front pay, $100 per day penalties, liquidated damages, attorney's fees, costs and expenses, equitable and injunctive relief as set forth below, and all other relief afforded to Plaintiff and the putative class by law.

## PRAYER FOR INJUNCTIVE RELIEF

Plaintiff Monique Sargent, individually on her own behalf and on behalf of the putative class, hereby requests that the Court order the following equitable and injunctive relief against MaineHealth:

A.      An order enjoining MaineHealth from implementing any further policies or practices that violate the FMLA.

B.      An order requiring MaineHealth to implement new policies and procedures for notifying employees of their eligibility to take leave under the FMLA,

certifying requests for leave once notice has been provided to employees, and designating/counting leave as FMLA-qualified.

C.      An order enjoining MaineHealth from continuing to take disciplinary or corrective action against employees who are absent from work due to a known or reasonably suspected need for intermittent or unplanned FMLA leave.

D.      An order enjoining MaineHealth from creating false, defamatory, or pretextual reasons for disciplining employees who need or have requested FMLA leave.

E.      An order requiring MaineHealth to train all of its supervisory and human resources professionals on the appropriate steps to be taken when notice is received of the need for intermittent FMLA leave.

F.      An order requiring MaineHealth to implement new policies and practices related to its "call out" procedures, in order to determine whether an unscheduled absence is due to an urgent need for intermittent FMLA leave.

G.      An order requiring MaineHealth to amend its "no fault" attendance policy to account for legal obligations imposed on MaineHealth by the FMLA and its implementing regulations.

H.      An order requiring MaineHealth to retract any and all defamatory statements about Plaintiff Monique Sargent, including without limitation those contained in her personnel file and those made in the course of disputing her right to collect unemployment benefits.

I.     An order requiring MaineHealth to retract any false or defamatory statements made about any other member of the putative class that was fabricated as a pretextual reason to terminate an employee who had unplanned absences that should have been protected under the FMLA.

J.     An order to disgorge any and all profits received by MaineHealth during any period of time it is found to have engaged in systemic policies or practices that violate the FMLA.

## JURY TRIAL DEMAND

Plaintiff Monique Sargent and all other members of the putative class hereby demand a jury trial on all matters so triable under the laws and Constitution of the United States and the State of Maine.

Respectfully submitted,

Dated: January 6, 2022                    */s/ Laura H. White*

_____
Laura H. White, Bar No. 4025
*Attorney for Plaintiff*
WHITE & QUINLAN, LLC
62 Portland Rd., Suite 21
Kennebunk, ME 04043
(207) 502-7484
lwhite@whiteandquinlan.com


/s/ *Danielle Quinlan*

_____
Danielle Quinlan, Bar No. 5480
*Attorney for Plaintiff*
WHITE & QUINLAN, LLC
62 Portland Rd., Suite 21
Kennebunk, ME 04043
(207) 502-7484
dquinlan@whiteandquinlan.com