UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| MONIQUE SARGENT, individually and on behalf of all those similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 2:22-cv-00006-JAW |
| MAINEHEALTH, | ) ) | |
| Defendant. | ) | |

**ORDER ON DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS**

A defendant parent company brings a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) arguing that the action against it should be dismissed because the plaintiff's claims were improperly split from a prior action filed against the defendant's subsidiary.  The Court concludes that the plaintiff improperly split her claims against the parent company and subsidiary and dismisses without prejudice the plaintiff's complaint against the parent company.

**I.   PROCEDURAL HISTORY**

On December 15, 2020, Monique Sargent filed a two-count complaint against NorDx alleging disability discrimination under the Americans with Disabilities Act (ADA) and the Maine Human Rights Act (MHRA).  *Sargent v. NorDx*, No. 20-cv-00467-JAW (*Sargent I*), *Compl.* at 5-6 (ECF No. 1) (*Sargent I Compl.*).  NorDx answered the complaint on April 23, 2021.  *Sargent I, Def.'s Answer to Pl.'s Compl.*

(ECF No. 5).  The Magistrate Judge set the discovery deadline for January 10, 2022. *Sargent I*, *Order* (ECF No. 12).

On January 6, 2022, Ms. Sargent filed a four-count class-action lawsuit against MaineHealth alleging retaliation and interference with her rights under the Federal Family Medical Leave Act (FMLA), and discrimination and interference with her rights under the Maine Family Medical Leave Act (Maine FMLA).  *Sargent v. MaineHealth*, No. 22-cv-00006-JAW (*Sargent II*), *Compl.* at 26-31 (ECF No. 1) (*Sargent II Compl.*).  That same day, Ms. Sargent filed a motion to amend the scheduling order in *Sargent I*.  *Sargent I*, *Pl.'s Mot. to Amend Scheduling Order* (ECF No. 14).  On January 11, 2022, NorDx opposed Ms. Sargent's motion to amend the scheduling order.  *Sargent I*, *Def.'s Opp'n to Pl.'s Mot. to Amend Scheduling Order* (ECF No. 16).  In its opposition, NorDx indicated that it would move to stay *Sargent I* pending the resolution of *Sargent II*, and that its parent company MaineHealth intended to imminently file a motion to dismiss *Sargent II*.  *Id.* at 1, 5-6; *Sargent I*, *Mot. to Stay* (ECF No. 18).  On January 12, 2022, Ms. Sargent responded to NorDx's motion to stay indicating that she did not oppose the stay.  *Sargent I*, *Pl.'s Resp. to Def.'s Mot. to Stay* at 2 (ECF No. 19).  On January 13, 2022, the Magistrate Judge issued an order granting NorDx's motion to stay and deferring ruling on the motion to amend the *Sargent I* scheduling order pending resolution of MaineHealth's anticipated motion to dismiss in *Sargent II*.  *Sargent I*, *Order* (ECF No. 20).

On February 14, 2022, MaineHealth filed a motion for judgment on the pleadings in *Sargent II*.  *Sargent II*, *Def.'s Mot. for J. on the Pleadings* (ECF No. 6)

(*Def.'s Mot.*).  On March 21, 2022, Ms. Sargent filed her opposition to MaineHealth's motion for judgment on the pleadings.  *Sargent II, Pl.'s Opp'n to Def.'s Mot. for J. on the Pleadings* (ECF No. 10) (*Pl.'s Opp'n*).  MaineHealth replied on April 1, 2022. *Sargent II, Def.'s Reply in Supp. of Mot. for J. on the Pleadings* (ECF No. 11) (*Def.'s Reply*).

## II.    FACTS[1]

### A.    The Parties

MaineHealth is a non-profit corporation organized in the state of Maine. *Sargent II Compl.* ¶ 5.  It is the largest healthcare organization in the state and is the parent company to multiple integrated healthcare providers operating under the "MaineHealth" umbrella.  *Id.*  NorDx is a MaineHealth subsidiary and is authorized by the state of Maine to operate as a human specimen laboratory.  *Id.* ¶ 6.  Ms. Sargent is a resident of Biddeford, Maine, and was hired by NorDx in 2016 as a phlebotomist in NorDx's Biddeford oncology office.  *Id.* ¶¶ 4, 24.

Ms. Sargent alleges that she was jointly employed by MaineHealth and NorDx because they share common management, ownership, direction and control,

---

[1]      "A motion for judgment on the pleadings bears a strong family resemblance to a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), and these two types of motions are treated in much the same way."  *Kando v. R.I. State Bd. of Elections*, 880 F.3d 53, 58 (1st Cir. 2018) (citing *Aponte-Torres v. Univ. of P.R.*, 445 F.3d 50, 54 (1st Cir. 2006)).  Accordingly, the Court relies upon the allegations in Ms. Sargent's complaints in both *Sargent I* and *Sargent II*.  *Foley v. Wells Fargo Bank, N.A.*, 772 F.3d 63, 68 (1st Cir. 2014); *Medina-Velázquez v. Hernández-Gregorat*, 767 F.3d 103, 108 (1st Cir. 2014) ("We examine whether the operative complaint states a claim for which relief can be granted when we construe the well-pleaded facts in the light most favorable to the plaintiffs, accepting their truth and drawing all reasonable inferences in the plaintiffs' favor" (internal citation omitted)). Moreover, "[a] court 'is entitled to take judicial notice of all related proceedings and records in cases before the same court.'" *Gladu v. Correct Care Sols.*, No. 2:15-cv-00384-JAW, 2017 U.S. Dist. LEXIS 53465, at *9-10 (D. Me. Apr. 7, 2017) (quoting *Doustout v. G.D. Searle & Co.*, 684 F. Supp. 16, 17 n.1 (D. Me. 1988)).  The Court may therefore look to the pleadings in the related case, *Sargent I.*

administration of employee benefits, operations, employee health services, labor counsel, and human resources. *Id.* ¶ 9. As a NorDx employee, Ms. Sargent was also considered a "MaineHealth System Employee" working at the "SMHC Biddeford Specimen Mgmt" department, which was also referred to as the "NDX Specimen Mgmt SMMC." *Id.* ¶¶ 10, 12. Employee documents and payroll records indicate that Ms. Sargent worked for a company called "MaineHealth." *Id.* ¶¶ 11, 14. Ms. Sargent signed a "MaineHealth Confidentiality Agreement" upon her hiring, and she was subject to MaineHealth's attendance policy and code of conduct. *Id.* ¶¶ 13, 17-18. Ms. Sargent also states that MaineHealth posted the job description for her position as "Phlebotomist II" and listed "NorDx" as the relevant facility. *Id.* ¶ 19. Finally, Ms. Sargent's work email address ended in "mmc.org" and when she filed paperwork with the Department of Labor following her termination from NorDx, "Maine Medical Center" was the listed employer. *Id.* ¶¶ 13, 15-19.

## B.   *Sargent I*

In her first lawsuit filed on December 20, 2020, Ms. Sargent alleges that NorDx violated the ADA and the MHRA by discriminating against her on the basis of her disability. *Sargent I Compl.* ¶¶ 30-39. Ms. Sargent states that she has substantial disfigurement involving extensive oral and tooth decay from a family history of "soft teeth," exacerbated by asthma and ADHD medication. *Id.* ¶¶ 12-14. She says that her tooth decay is so severe that she tries to hide her teeth when she speaks and avoids revealing her teeth when smiling. *Id.* ¶ 13.

In April 2019, Human Resources (HR) informed Ms. Sargent that she was being transferred from the NorDx oncology office because her teeth did not conform

with NorDx's image. *Id.* ¶ 16. In a meeting with HR employee Cassie Christie, Ms. Christie informed Ms. Sargent that her appearance did not fit with the "image South Portland was trying to receive" and threatened that Ms. Sargent would be out of work until she fixed her teeth. *Id.* ¶¶ 17-18. Ms. Sargent contends that she would need more time to save money to have her teeth fixed and being out of work would make it impossible for her to have the procedure done. *Id.* ¶ 18.

NorDx ultimately allowed Ms. Sargent to continue to work in the NorDx office but mandated that she wear a mask at all times, regardless of whether she felt ill. *Id.* ¶¶ 19-20. Ms. Sargent alleges that up until April 2019 she was never asked to wear a mask because of her appearance or because of bad breath, and was, instead, praised by her patients for her phlebotomy procedures. *Id.* ¶¶ 21-23. Ms. Sargent says she was shortly thereafter terminated for improperly viewing patient records, which she contends was a pretext for termination on the basis of her medical condition. *Id.* ¶¶ 25-26. She further asserts that she only reviewed patient records of those individuals she worked with directly or who were the patients of other phlebotomists in the oncology office who requested her assistance. *Id.* ¶ 27.

## C.     *Sargent II*

In her second lawsuit filed on January 6, 2022, Ms. Sargent asserts that MaineHealth and NorDx have a longstanding pattern of FMLA retaliation. She explains that she previously worked for NorDx, asserting that NorDx fabricated pretextual reasons to terminate her after she requested medical leave in 2013. *Sargent II Compl.* ¶¶ 25-26. Ms. Sargent says that MaineHealth and NorDx would

not have rehired her in 2016 had the 2013 accusations leading to her termination been true. *Id.* ¶ 27.

By 2018 Ms. Sargent was again eligible for FMLA leave and needed it to take her son to therapy three times per week and to doctor's appointments due to his mental health. *Id.* ¶¶ 29-30. NorDx employees, team lead Christie Gerrish and Ms. Sargent's supervisor,[2] Irina Bachand, were both aware of this need, but NorDx failed to give Ms. Sargent notice of her rights under FMLA. *Id.* ¶ 31. In early January, 2019, Ms. Sargent requested two hours of paid time off (PTO) on January 22, 2019, so she could take her son to a doctor's appointment; she requested an "early lunch" on February 3, 2019, so that she could take her son to a doctor's appointment that would "only take about an hour"; and she requested four hours of PTO on February 7, 2019, so she could take her boys to a dentist appointment. *Id.* ¶¶ 32-34.

As team lead, Ms. Gerrish's role was to assist with scheduling issues if a phlebotomist who had been scheduled at a particular location called out. *Id.* ¶ 35. On January 18, 2019, Ms. Gerrish contacted Ms. Sargent via Facebook Messenger at 7:30 am, a half hour before her scheduled shift in Biddeford was set to start, to ask Ms. Sargent if she could instead work in the NorDx South Portland Office that day. *Id.* ¶ 36. Ms. Sargent explained that her daughters' cheering competition was scheduled for that afternoon, and she would prefer not to go to the South Portland

---

[2]      Paragraph 31 of the Sargent II Complaint states: "NorDx employees, team lead (Christie Gerrish) and her supervisor, (Irina Bachand), were both aware of Sargent's need to take intermittent leave . . . ." *Sargent II Compl.* ¶ 31. The way this is written, the Court cannot tell whether Mr. Bachand was Ms. Sargent's supervisor or Ms. Gerrish's supervisor. For purposes of its recitation of the facts in the Sargent II Complaint, the Court assumes that Ms. Bachand was Ms. Sargent's supervisor, but this issue is immaterial to the resolution of the pending motion.

office because she would miss the cheer competition. *Id.* ¶ 37. Ms. Gerrish told Ms. Sargent to report to the Biddeford office as scheduled and that she would try to get another phlebotomist to cover the South Portland office. *Id.*

However, on January 29, 2019, Ms. Bachand wrote up Ms. Sargent for not reporting to the South Portland office on January 18, 2019. *Id.* ¶ 38. NorDx gives phlebotomists two weeks' advance notice of the location where they are to work on a given day. *Id.* ¶ 40. On January 24, 2019, Ms. Bachand wrote to Ms. Gerrish about Ms. Sargent stating that "we give two weeks [sic] notice on these things . . . if it's more you don't need her approval," which Ms. Sargent says establishes that less than two weeks' notice of a schedule change does require an employee's pre-approval, and that an employee who cannot change her schedule at the last minute is not insubordinate, as Ms. Bachand wrote on Ms. Sargent's January 29, 2019, corrective action. *Id.* Ms. Sargent notes that although Ms. Bachand did not write her up with a corrective action until January 29, 2019, she says that between January 18 and January 29, Ms. Bachand and Ms. Gerrish exchanged emails discussing that Ms. Sargent was unable to cover an upcoming shift because she needed an hour off between 9:15-10:15 am for an appointment, which Ms. Sargent submits should have been protected by the FMLA. *Id.* ¶ 43. Ms. Sargent contends that the timing of the events gives rise to a strong inference of retaliation under the FMLA, and that Ms. Bachand had notice of Ms. Sargent's need for medical leave but never took the steps to advise Ms. Sargent of her FMLA rights and responsibilities. *Id.* ¶¶ 44-45.

At the time of the events in January 2019, Ms. Gerrish was living with Ms. Sargent. *Id.* ¶ 46. On January 31, 2019, Ms. Sargent received a call from her landlord that an ambulance was parked in her driveway. *Id.* ¶ 47. Ms. Sargent returned home to learn that Ms. Gerrish found her baby daughter unresponsive in the home, that Ms. Gerrish had attempted to administer CPR on Ms. Sargent's kitchen table in the presence of Ms. Sargent's children, and that Ms. Gerrish's daughter had died from SIDS.[3] *Id.* ¶¶ 48-49. As a result of the events Ms. Sargent's children were traumatized and Ms. Sargent's son had a panic attack caused by the trauma of the events. *Id.* ¶ 49. From January 31 into the morning of February 1, 2019, Ms. Sargent and her family remained with Ms. Gerrish to be interviewed by first responders and the police. *Id.* ¶ 50.

After having been up all night, Ms. Sargent was unable to go to work the following day on February 1, 2019, and none of Ms. Sargent's children was physically or mentally capable of going to school. *Id.* ¶ 51. Ms. Sargent determined that it would have been unsafe for her to draw blood, so she called out of work. *Id.* However, NorDx did not consider this absence protected by the FMLA and instead cited Ms. Sargent for unexcused absences from work. *Id.* Everyone at NorDx who worked closely with Ms. Gerrish and Ms. Sargent was aware that Ms. Sargent and/or her children witnessed the traumatic events. *Id.* ¶ 52. Patricia Hazard, HR Director, sent an

---

[3]    The Sargent II Complaint uses the abbreviation SIDS. *Sargent II Compl.* ¶ 49. The Court assumes the Complaint is referring to the common abbreviation for Sudden Infant Death Syndrome.

email to all SMMC[4] lab staff, including Ms. Bachand, discussing a PTO donation to Ms. Gerrish. *Id.* Kathy Messier, Ms. Sargent's colleague, also suggested a PTO donation for Ms. Sargent. *Id.*

Ms. Gerrish's daughter's funeral was scheduled for February 5, 2019, and Ms. Gerrish asked Ms. Sargent to attend. *Id.* ¶ 53. Ms. Sargent thereafter emailed Ms. Bachand and others asking for coverage and bereavement leave on February 5, 2019, so that she could attend the baby's funeral, as well as a memorial service for her husband's grandmother that was scheduled for that afternoon. *Id.* Ms. Sargent called out of work on February 5, 2019, and Ms. Bachand counted this as an unexcused absence and included it in the same corrective action disciplining her for missing work on February 1, 2019. *Id.* ¶ 55.

Ms. Bachand began to investigate Ms. Sargent's requests for bereavement leave related to the baby's death and funeral. *Id.* ¶ 56. Under MaineHealth's policy, bereavement leave is defined as "leave granted to give employees time to arrange and attend funeral services for a member of their immediate family." *Id.* ¶ 57. "Immediate family" includes "other relative[s] living in the same household" which Ms. Sargent reasonably believed to include Ms. Gerrish's baby, as Ms. Gerrish was living in Ms. Sargent's home and Ms. Gerrish's children called Ms. Sargent "auntie." *Id.*

---

[4] The Sargent II Complaint uses the abbreviation SMMC. *Sargent II Compl.* ¶ 52. The Court assumes that the Complaint is referring to Southern Maine Medical Center, which the Court understands is a division of MaineHealth.

On February 13, 2019, Ms. Sargent requested three hours of PTO for March 1, 2019, to take her daughter to a dentist appointment and four hours of PTO on March 21, 2019, for her child's orthodontist appointment. *Id.* ¶¶ 58-59. On February 14, 2019, Ms. Sargent notified Ms. Bachand that because she fell injuring her shoulder and neck, she may have difficulty drawing blood at "weird angles" the next day. *Id.* ¶ 60. Ms. Bachand did not notify Ms. Sargent of her right to take intermittent FMLA leave. *Id.*

On February 25, 2019, and March 7, 2019, Ms. Bachand asked Ms. Sargent to pick up extra shifts in the evening and/or on the weekend, which Ms. Sargent told her she could not do because she needed to spend time with her children and/or care for a sick child. *Id.* ¶¶ 61-62. On March 11, 2019, Ms. Bachand gave Ms. Sargent a corrective action for the period of time Ms. Sargent called out of work to attend the baby's funeral on February 5, 2019. *Id.* ¶ 64. Ms. Bachand wrote that "[u]pon investigation, it was found that [Ms. Sargent] does not have any familial relation to the person"; Ms. Bachand accused Ms. Sargent of acting dishonestly and violating the code of conduct by making "false and misleading statements" about her relationship with Ms. Gerrish's deceased child. *Id.* ¶ 64.

On March 13, 2019, Ms. Bachand gave Ms. Sargent a third corrective action to discipline Ms. Sargent for "accruing 6 unscheduled absences in a rolling calendar year" in violation of NorDx policy. *Id.* ¶ 65. Ms. Sargent contends that two of the absences were related to Ms. Gerrish's daughter's death and should have been excused. *Id.* One of the unexcused absences occurred on November 8, 2018, when

Ms. Sargent had to take her son to the emergency department. *Id.* ¶ 67. There is no record of Ms. Sargent having obtained PTO approval in advance because it was an emergency, but Ms. Sargent says she gave NorDx enough information about the absence to put it on notice of her need for FMLA-protected leave. *Id.* A second incident flagged in the corrective action occurred on April 6, 2018, when Ms. Sargent was late to work because she had to bring her son to the doctor. *Id.* ¶ 68. The March 13, 2019, corrective action informed Ms. Sargent that "[i]f you or a family member has a serious health condition, you may qualify for FMLA." *Id.* ¶ 69.

On March 18, 2019, Ms. Sargent notified NorDx that she was running late because she had to bring her son to the doctor's. *Id.* ¶ 70. The employee who took Ms. Sargent's call recorded the reason for her tardiness as "Family & Medical Leave –Family – FML[A]." *Id.* The absence log entry was sent via email to Ms. Bachand and others, putting them on notice that Ms. Sargent had a need for intermittent FMLA leave. *Id.*

On March 19, 2019, Ms. Sargent emailed Ms. Bachand asking to change her schedule to come in to work early and leave by 3:30 so she could bring her son to a doctor's appointment at 4:00 pm. *Id.* ¶ 71. Ms. Bachand ignored the request and instead asked Ms. Sargent to work in South Portland until 4pm. *Id.* Ms. Sargent again reiterated her request and alleges that instead of treating the request as one for intermittent leave protected by the FMLA, Ms. Bachand wrote "Waiting on confirmation, but it's looking like it'll be okay." *Id.* Ms. Sargent submits that she

should not have had to repeatedly ask to leave early or emphatically thank her supervisor in order to take protected FMLA leave.  *Id.*

On March 28, 2019, Ms. Sargent submitted a time off request for four hours of PTO on April 16, 2019, and three hours on May 7, 2019 (later changing that request to eight hours), to bring her daughter to the orthodontist to have braces put on.  *Id.* ¶¶ 72-73.  She also requested a full eight hours of PTO for April 30, 2019, for two medical appointments for her daughter.  *Id.* ¶ 74.

On April 2, 2019, in an email exchange between Ms. Bachand and Ms. Gerrish, Ms. Gerrish stated that "Monique makes my brain want to explode" and Ms. Bachand responded, "agreed."  *Id.* ¶ 75.  On April 25, 2019, Ms. Gerrish forwarded to Ms. Bachand an email with Ms. Sargent where Ms. Sargent told Ms. Gerrish that she could not work Monday morning rounds.  *Id.* ¶ 76.  Ms. Gerrish wrote to Ms. Bachand, "you called it" followed by "smh," which means "shake my head."  *Id.*

Ms. Bachand and HR Partner Cassie Christie, recommended Ms. Sargent for termination, at which time HR Director Patricia Hazard, asked if Ms. Sargent was on any protected leave.  *Id.* ¶ 78.  HR responded that the "Unum login" was not working, but that the "HR Solution Center" listed Ms. Sargent as being on intermittent FMLA leave between March and April 16, 2019.  *Id.*  NorDx has no record that Ms. Sargent was advised of her FMLA rights and responsibilities.  *Id.* ¶ 79.

Ms. Sargent alleges that NorDx intensified its efforts to terminate her employment in April and May 2019, during which time NorDx relocated Ms. Sargent

from the Biddeford oncology office to a Saco draw station, claiming that patients were complaining about her teeth in the oncology office. *Id.* ¶ 81. Ms. Sargent further alleges that NorDx's accusations grew more egregious in May 2019 when MaineHealth created an anonymous complaint about her despite no record of an actual complaining patient. *Id.* ¶ 84. It was around this time that Ms. Sargent says Ms. Bachand falsely accused her of HIPAA violations for accessing charts for patients she was no longer assigned to. *Id.* ¶ 85. Ms. Sargent maintains that she only accessed the patient charts in order to answer co-worker questions about those patients. *Id.*

## III.   THE PARTIES' POSITIONS

### A.   **MaineHealth's Motion for Judgment on the Pleadings**

MaineHealth brings a motion pursuant to Federal Rule of Civil Procedure 12(c) requesting that the Court dismiss *Sargent II* with prejudice because Ms. Sargent has "improperly split her claims in order [to] avoid demonstrating good cause for amendment of her pleading" in *Sargent I. Def.'s Mot.* at 1. MaineHealth contends that Ms. Sargent's counsel initially informed it that she would move to amend her *Sargent I* complaint to add FMLA claims but that Ms. Sargent reversed course, stating her intent to file a second action against NorDx and MaineHealth and that she would seek to consolidate the two actions. *Id.* at 2. Following a recitation of the facts, MaineHealth asserts that "[i]n both *Sargent I* and *Sargent II*, Plaintiff challenges the actions and motivations of the same decision-makers in NorDx human resources and management, over the same period of time." *Id.* at 4. As a result, "the Court can reasonably and accurately infer that th[e] same history of progressive discipline [in *Sargent II*] is directly at issue in [*Sargent I*]. *Id.* at 5.

In its analysis, MaineHealth submits that "[t]he doctrine against claim splitting is closely related to the doctrine of claim preclusion," and that, specifically, "the claim splitting defense turns on establishing the second and third elements of the test for claim preclusion" namely sufficient identicality between the causes of action and the parties. *Id.* at 5-6.

In application, MaineHealth argues that the FMLA suit (*Sargent II*) "arise[s] from the same employment relationship and nucleus of operative facts as [the] discrimination claims in *Sargent I*" because "[b]oth sets of claims encompass the same time period, the same decision-makers, . . . the same allegedly adverse employment action . . . [and] also involve effectively the same parties." *Id.* at 6. It differentiates the two suits primarily on Ms. Sargent's allegations of pretext in her termination, namely disability discrimination in *Sargent I* and FMLA retaliation in *Sargent II*. *Id.* at 10. In sum, MaineHealth submits that "there is no escaping the conclusion that the two sets of claims are 'related in time, space, origin, or motivation,' and would constitute a 'convenient trial unit.'" *Id.* at 11 (quoting *Havercombe v. Dep't of Educ. of the Commonwealth of P.R.*, 250 F.3d 1, 4-5 (1st Cir. 2001)).

Furthermore, MaineHealth contends that "the parties in both cases are effectively identical for claim-splitting purposes." *Id.* It specifically points to Ms. Sargent's admission in her *Sargent II* complaint that NorDx is a subsidiary of MaineHealth and shares its ownership, management, operations, and human resources functions, arguing that "Plaintiff plainly could have asserted her FMLA claims against NorDx directly in *Sargent I*, or she could have added MaineHealth as

14

a party to that action and asserted these claims against MaineHealth, NorDx, or both." *Id.* at 12.  It further argues that Ms. Sargent's "styling of *Sargent II* as a class action" does not save the case from dismissal because "Sargent is the only named plaintiff in both actions, and it is axiomatic that claim preclusion applies to the named plaintiffs in class actions, regardless of the outcome of the suit as to the unnamed class members or whether the class is ever certified." *Id.* at 12-13.

In conclusion, MaineHealth asserts that although a court may dismiss, stay, enjoin, or consolidate a duplicative suit, here "the appropriate remedy is for the Court to dismiss *Sargent II* with prejudice, unless Plaintiff seeks and is granted leave to amend in *Sargent I.*" *Id.* at 13.  MaineHealth says that "there is no valid justification for Plaintiff bringing a second suit rather than seeking to amend her complaint in *Sargent I*" where Ms. Sargent "has not alleged any facts in *Sargent II* that were unavailable to her prior to filing *Sargent I*, as both suits arise out of her employment relationship with Defendants and both sets of claims had accrued as of her termination in May 2019." *Id.*  MaineHealth ultimately labels *Sargent II* "the type of gamesmanship that the rule against claim splitting is intended to prevent." *Id.* at 14.

### B.    Monique Sargent's Opposition

Ms. Sargent contends that "*Sargent II* should proceed through discovery as the more time-consuming and complex FMLA class action that seeks to consolidate and adjudicate the rights of many employees" and that *Sargent I* should remain stayed to "eliminate any 'vexatious' problems associated with concurrent litigation." *Pl.'s Opp'n* at 2.  She further submits that "[b]ecause not a single deposition was conducted

in [*Sargent I*] until December 13, 2021, MaineHealth would not have been prejudiced by Plaintiff requesting leave to amend to add an FMLA claim." *Id.* at 3. She says that "while litigating *Sargent I* in the Maine Human Rights Commission, Plaintiff never saw documents related to rights and responsibilities under the FMLA." *Id.* at 4. As a result, Ms. Sargent contends that she "had very little information about the basis for an FMLA claim until the deposition stage" and it was "only after counsel sat through Plaintiff's deposition . . . that the full extent of NorDx's FMLA violations were realized." *Id.*

Ms. Sargent further argues that "[t]he lag time between *Sargent I*'s July 9, 2021, deadline to amend and the depositions that occurred in December of 2021 was a product of mutual agreement by the parties, not a lack of diligence" on her part. *Id.* She therefore contends that she "would have met the Rule 16(b) 'good cause' standard to amend in January of 2022" but instead chose, in light of Ms. Bachand's deposition testimony, to file a new suit because the "systemic nature" of the FMLA violations made "clear that a class action was appropriate."[5] *Id.* at 4-5. "Even if [her] individual FMLA claim were added to *Sargent I*," Ms. Sargent says that "the remaining putative class members' interests would not be adjudicated." *Id.* at 5. As a result, she says that "[j]udicial economy would be promoted . . . [i]f this Court stays *Sargent I* through

---

[5]     Ms. Sargent attaches her deposition in *Sargent I* to support her opposition. However, in resolving a Rule 12(c) motion the Court can only consider "documents incorporate by reference into the complaint, matters of public record, and facts susceptible to judicial notice." *Grajales v. P.R. Ports Auth.*, 682 F.3d 40, 44 (1st Cir. 2012); *see also Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33-34 (1st Cir. 2001) (explaining when a court my rely on documents extrinsic to the complaint in resolving a 12(b)(6) motion to dismiss). Ms. Sargent did not incorporate by reference her deposition into the *Sargent II* complaint, nor is the deposition a matter of public record or information that the Court may take judicial notice of. The Court therefore does not consider the deposition in resolving this motion.

limited discovery and a determination of whether class certification is appropriate in *Sargent II*." *Id.* at 6. Ms. Sargent thus urges the Court to defer ruling on MaineHealth's motion "until such time as the class certification issue has been decided." *Id.*

As to the merits, Ms. Sargent argues that "[t]he First Circuit does not endorse dismissal or bar concurrent litigation between similar parties absent of a final judgment." *Id.* at 8. Specifically, she says that MaineHealth "conflates the concept of claim preclusion resulting from a final judgment with a common law doctrine of 'claim-splitting'" and that the cases cited by MaineHealth "have no bearing here because [*Sargent I*] has no final judgment." *Id.* Alternatively, Ms. Sargent contends that the Court should look to "[n]ormal principles of *res judicata*" which "do not warrant dismissal of the instant action in the absence of a final judgment, especially where [she] advocates for a continued stay in *Sargent I* to avoid duplicative litigation or inconsistent outcomes." *Id.* at 11.

Finally, Ms. Sargent argues that other employees' potential involvement in *Sargent II* should change the claim preclusion analysis. Ms. Sargent distinguishes this case from *Airframe Systems v. Raytheon Co.*, 601 F.3d 9 (1st Cir. 2010), because she is representing a larger class of plaintiffs as part of a class action. She submits that because this case could potentially involve 22,000 current employees and tens of thousands of former employees going back six years, "[t]he universe of potential class members in *Sargent II*, compared to the lone plaintiff in *Sargent I*, renders Defendant's claim-splitting argument meritless." *Id.* at 14.

### C.    MaineHealth's Reply

MaineHealth contests Ms. Sargent's assertion that she lacked information to support her FMLA claim until Ms. Bachand's deposition in December 2021. *Def.'s Reply* at 2. Specifically, MaineHealth asserts that Ms. Bachand only testified that she did not know whether NorDx did or did not provide Ms. Sargent with a copy of her FMLA rights because the requirement to do so did not fall within her job responsibilities. *Id.* As a result, MaineHealth asserts Ms. Sargent would not have good cause to amend her complaint in *Sargent I*. *Id.*

According to MaineHealth, Ms. Sargent conceded that *Sargent II* is duplicative and advanced no valid argument against its dismissal. *Id.* at 3. In fact, MaineHealth advances that the "Plaintiff's arguments [to stay *Sargent I* while she pursues discovery and class certification in *Sargent II*] are contrary to settled law and reflect an extraordinary disregard for the equitable considerations underpinning the claim splitting doctrine." *Id.* It reiterates that "[c]laim splitting is . . . improper in the First Circuit as it is in every other jurisdiction," noting that "the First Circuit has found that a defendant who fails to object to claim splitting during the pendency of the first filed action will be deemed to have waived *res judicata* as a defense to the second action." *Id.*

Furthermore, MaineHealth submits that "*Sargent II*'s status as a putative class action is immaterial because the only named plaintiff's claims are barred by the claim splitting doctrine." *Id.* at 4. It says that Ms. Sargent "misperceives the issue" because "[t]he question is not whether the 'thousands' of unnamed putative class members have split their claims, but whether the named plaintiff has." *Id.*

MaineHealth reasons that the *Sargent II* "claims are not suitable for class treatment, which contributes to questions about Plaintiff's motive" as "[t]he United States Supreme Court has very clearly held that . . . claims [alleging unlawful application of FMLA policies by individual managers] are not appropriate for class action treatment." *Id.* (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)).

Although MaineHealth admits that "the Court has broad discretion here," it submits that "permitting [the] Plaintiff to proceed with *Sargent II* while staying *Sargent I* would be an abuse of that discretion." *Id.* at 5. It says that "[s]ubordinating the first-filed case over the objection of the defendant and permitting the second-filed case to proceed is notably absent from the list of discretionary options available to the Court." *Id.* MaineHealth concludes by reiterating that "[d]ismissal of *Sargent II* with prejudice is not only warranted, [but] is necessary to protect Defendant from legal prejudice" and that no option other than dismissal with prejudice "simultaneously protect[s] Defendant's interests and further[s] the policies behind the claim splitting prohibition." *Id.* at 6. It contends that "[c]onsolidation is patently inappropriate insofar as it would have the effect of granting Plaintiff an end run around the Scheduling Order in *Sargent I* and obviate the need for Plaintiff to demonstrate good cause for late amendment in that case." *Id.* As to its request that the Court dismiss *Sargent II* with prejudice, MaineHealth submits that dismissal without prejudice "would be the most prejudicial result here because it would enable Plaintiff to refile in state court, asserting only state law claims and depriving Defendant of a valid claim splitting defense." *Id.* at 7.

19

## IV.   LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(c) "a party may move for judgment on the pleadings" any time "[a]fter the pleadings are closed—but early enough not to delay trial." FED. R. CIV. P. 12(c).  "A Rule 12(c) motion is 'ordinarily accorded much the same treatment' as a Rule 12(b)(6) motion; the 'modest difference' is that, unlike a Rule 12(b)(6) motion, a Rule 12(c) motion 'implicates the pleadings as a whole.'"  *Musto v. Liberty Ins. Corp.*, No. 1:20-cv-00188-GZS, 2020 U.S. Dist. LEXIS 229194, at *1 (D. Me. Dec. 7, 2020) (quoting *Aponte-Torres v. Univ. of P.R.*, 445 F.3d 50, 54-55 (1st Cir. 2006)).  Thus, to survive dismissal on a Rule 12(c) motion, "the plaintiff must have alleged sufficient factual matter in the pleadings 'to state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted)); *see also Rios-Campbell v. United States DOC*, 927 F.3d 21, 24 (1st Cir. 2019) ("If a motion for judgment on the pleadings . . . is employed as a vehicle to test the plausibility of a complaint, the Rule 12(b)(6) plausibility standard may again come front and center" (alterations in *Rios-Campbell*) (internal quotation marks omitted) (quoting *Grajales v. P.R. Ports Auth.*, 682 F.3d 40, 44 (1st Cir. 2012))).

"Because [a Rule 12(c)] motion calls for an assessment of the merits of the case at an embryonic stage, the court must view the facts contained in the pleadings in the light most favorable to the nonmovant and draw all reasonable inferences therefrom."  *Collins v. Me. State Prison Warden*, No. 1:18-cv-00435-NT, 2019 U.S. Dist. LEXIS 53748, at *3 (D. Me. Mar. 29, 2019) (internal quotation marks omitted) (alterations in *Collins*) (quoting *R.G. Fin. Corp. v. Vergara-Nunez*, 446 F.3d 178, 182

(1st Cir. 2006)).  "Like Rule 12(b)(6), Rule 12(c) does not allow for any resolution of contested facts; rather, a court may enter judgment on the pleadings only if the uncontested and properly considered facts conclusively establish the movant's entitlement to a favorable judgment."  *Musto*, 2020 U.S. Dist. LEXIS 229194, at *2 (quoting *ACA Connects – Am.'s Commc'ns Ass'n v. Frey*, 471 F. Supp. 3d 318, 323 (D. Me. 2020)).

## V.   DISCUSSION

As a general principle "[a] litigant with multiple related claims must not separate, or split, the claims into multiple, successive cases, but must include in the first action all of the claims that fall within the Court's jurisdiction."  *Perry v. Alexander*, No. 2:15-cv-00310-JCN, 2017 U.S. Dist. LEXIS 112019, at *7-8 (D. Me. July 19, 2017) (citing *Kale v. Combined Ins. Co. of Am.*, 924 F.2d 1161, 1165 (1st Cir. 1991)).  Undergirding this rule is the principle that "[b]y spreading claims around in multiple lawsuits . . . parties waste 'scarce judicial resources' and undermine 'the efficient and comprehensive disposition of cases.'"  *Katz v. Gerardi*, 655 F.3d 1212, 1217 (10th Cir. 2011) (quoting *Hartsel Springs Ranch of Colo., Inc. v. Bluegreen Corp.*, 296 F.3d 982, 985 (10th Cir. 2002)).

Whether an action is duplicative of another turns on whether the "claims, parties, and available relief do not significantly differ between the two actions."  *Carey v. Hillsborough Cnty. Dep't of Corr.*, No. 05-cv-442-PB, 2006 U.S. Dist. LEXIS 23515, at *7 (D.N.H. Mar. 6, 2006) (quoting *Serlin v. Arthur Andersen & Co.*, 3 F.3d 221, 223 (7th Cir. 1993)).  Courts apply res judicata principles, although "the claim-

splitting doctrine does not fall within a conventional res judicata analysis."[6]  *Katz*, 655 F.3d at 1218 (discussing the differences between claim splitting and res judicata); *see also Scholz v. United States*, 18 F.4th 941, 952 (7th Cir. 2021) ("Thus, to determine whether the district court correctly dismissed this case on claim-splitting grounds, we must draw on principles of claim preclusion, although continuing to appreciate the differences between the doctrines"); *Hartsel*, 296 F.3d at 986 ("[M]ore recent cases analyze claim-splitting as an aspect of res judicata").

"While claim-splitting and res judicata both promote judicial economy and shield parties from vexatious and duplicative litigation, claim splitting is more concerned with the district court's comprehensive management of its docket, whereas res judicata focuses on protecting finality of judgments."  *Perry*, 2017 U.S. Dist. LEXIS 112019, at *8 (quoting *Vanover v. NCO Fin. Servs., Inc.*, 857 F.3d 833 (11th Cir. 2017) (internal quotation marks omitted)).  District courts are, accordingly, given "'a great deal of latitude and discretion' in determining whether one action is

---

[6]     Ms. Sargent contends that the "Defendant conflates the concept of claim preclusion resulting from a final judgment with a common law doctrine of 'claim-splitting'" and that the First Circuit caselaw "analyz[ing] the elements of claim preclusion . . . ha[s] no bearing here because [there is] no final judgment."  *Pl.'s Opp'n* at 8.  The Court disagrees.  This District and other courts have consistently relied on res judicata/claim preclusion concepts in analyzing claim splitting issues and have rejected arguments similar to those brought by Ms. Sargent.  *See Katz*, 655 F.3d at 1218 ("Infinity claims that there can be no claim splitting as long as there is no final judgment in the[ir] other case. We disagree.  While it is correct that a final judgment is necessary for traditional claim preclusion analysis, it is not required for the purposes of claim splitting"); *Perry*, 2017 U.S. Dist. LEXIS 112019, at *8 ("In the claim-splitting analysis, the test is whether the first suit, assuming it were final, would preclude the second suit" (internal quotation marks omitted) (citation omitted)).

Moreover, the First Circuit described the claim-splitting doctrine as "one application of the general doctrine of res judicata."  *Sutcliffe Storage & Warehouse Co. v. United States*, 162 F.2d 849, 852 (1st Cir. 1947).  Given the intersection of claim preclusion and claim splitting, it is proper for the Court to rely on First Circuit claim preclusion precedent for guidance in applying the "same parties" and "same action" prongs of the claim splitting test.  Finally, circuit courts have reversed trial courts that failed to apply the appropriate prongs of the res judicata analysis in such cases.  *See, e.g., Hartsel*, 296 F.3d at 987 ("The district court erred by applying the claim-splitting prohibition without requiring identity or privity between parties").

duplicative of another." *Carey*, 2006 U.S. Dist. LEXIS 23515 at *7 (quoting *Serlin*, 3 F.3d at 223); *see also Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) ("As between federal district courts . . . [although] no precise rule has evolved, the general principle is to avoid duplicative litigation"); *Katz*, 655 F.3d at 1217.

Typically, res judicata requires the following test: (1) a valid final judgment in the first suit; (2) the same parties; and (3) the same cause of action. *Hatch v. Trail King Indus.*, 699 F.3d 38, 45 (1st Cir. 2012). Unlike res judicata, claim splitting "applies where the second suit . . . has been filed before the first suit has reached a final judgment." *Laccinole v. Diversified Consultants, Inc.*, No. 1:19-CV-00149-MSM-LDA, 2020 U.S. Dist. LEXIS 65173, at *6 (D.R.I. Apr. 14, 2020). Thus, the test for claim splitting "is whether the first suit, assuming it were final, would preclude the second suit." *Perry*, 2017 U.S. Dist. LEXIS 112019, at *8 (quoting *Klane v. Mayhew*, No. 1:12-cv-203-NT, 2013 U.S. Dist. LEXIS 42053, at *5 (D. Me. Mar. 26, 2013)); *see also Scholz*, 18 F.4th at 952; *Katz*, 655 F.3d at 1218 ("It is clear that a motion to dismiss based on improper claim-splitting need not—indeed, often cannot—wait until the first suit reaches final judgment"); WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE § 4406 (3d ed. 2022) (WRIGHT & MILLER) ("In dealing with simultaneous actions on related theories, courts at times express principles of 'claim splitting' that are similar to claim preclusion, but that do not require a prior judgment"). Against this framework, courts recognize that "multiple federal filings do not lend themselves to a rigid test, but require instead that the

district court consider the equities of the situation when exercising its discretion." *Curtis*, 226 F.3d at 138.

In accordance with the above principles, the Court considers: (1) the "identicality between the causes of action asserted in" *Sargent I* and *Sargent II* and (2) the "identicality between the parties in the two actions." *Hatch*, 699 F.3d at 45.[7] Finally, the Court considers issues of equity to determine whether either party will be unfairly prejudiced.

### A.      Identicality of the Causes of Action

The First Circuit adopts the "transactional approach to determine whether causes of action are sufficiently related to support a res judicata defense." *Mass. Sch. of L. v. Am. Bar Ass'n*, 142 F.3d 26, 38 (1st Cir. 1998).  The Court accordingly applies the First Circuit's transactional approach to this portion of its claim-splitting analysis.

"Under this approach, a cause of action is defined as a set of facts which can be characterized as a single transaction or series of related transactions." *Id.* (quoting *Apparel Art Int'l, Inc. v. Amertex Enters., Ltd.*, 48 F.3d 576, 583 (1st Cir. 1995)).  The analysis "boils down to whether the causes of action arise out of a common nucleus of operative facts," *id.,* based on "factors such as 'whether the facts are related in time, space, origin, or motivation,' 'whether they form a convenient trial unit,' and whether

---

[7]      Although Ms. Sargent contends that "*Hatch* has no precedential effect here" because "the First Circuit's dismissal in *Hatch* was based on claim preclusion because of a final judgment, which the plaintiff opted not to appeal," *Pl.'s Opp'n* at 11, the Court disagrees.  As discussed in the previous footnote, because claim preclusion and claim splitting are interrelated, it is proper for this Court to rely on First Circuit claim preclusion precedent in applying the second two claim preclusion prongs as typically included in the claim-splitting analysis.

treating them as a unit 'conforms to the parties' expectations.'" *Gladu v. Correct Care Sols.*, No. 2:17-cv-00504-JAW, 2019 U.S. Dist. LEXIS 183228, at *19 (D. Me. Oct. 23, 2019) (quoting *Airframe Sys.*, 601 F.3d at 14).

To begin, the Court notes that it is immaterial that Ms. Sargent brought *Sargent II* under a different legal theory (FMLA) than in *Sargent I* (disability discrimination).  As other judges in this District have noted, the requirement that the cause of action be "identical" is a "red herring," as identicality is based on the similarity of the underlying factual disputes, rather than whether the two causes of action are the same.  *Webb v. Calais Reg'l Hosp.*, No. 1:21-cv-00261-LEW, 2022 U.S. Dist. LEXIS 10654, at *6 (D. Me. Jan. 20, 2022) (explaining that the identicality test aims to prevent gamesmanship by requiring plaintiffs to bring all their related claims in a single action).  Indeed, if a litigant initiated one lawsuit and later initiated a second based on precisely the same legal theories, a dismissal based on claim splitting would seem a foregone conclusion.

Here, *Sargent I* and *Sargent II* share a common nucleus of operative fact even though Ms. Sargent alleges some new facts and a new cause of action in *Sargent II*. *See id.* at *7 (concluding that a second case was "functionally identical" to the first case even though the "[p]laintiff . . . [came] before the court with additional facts and new legal theories as to why she may recover under law" because "the factual nucleus of [the] case remain[ed] the same").  In *Webb v. Calais Regional Hospital*, the district court determined that both the plaintiff's cases related to the same "series of occurrences" surrounding a patient's stillbirth in 2014, "the Hospital's protracted

investigation into mistakes leading up to that incident, and the Hospital's ultimate decision to terminate Plaintiff's employment." *Id.* The same is true here.

First, both *Sargent I* and *Sargent II* center on the time period in early 2019 leading up to Ms. Sargent's termination in May 2019. "The determinative question . . . is not whether [Ms. Sargent] *did* previously raise claims relating to [NorDx's] alleged [FMLA retaliation], but whether she 'could have' done so." *Id.* at *7-8 (emphasis in *Webb*) (quoting *Haag v. United States*, 589 F.3d 43, 46 (1st Cir. 2009)). The shared time frame is important as the events that Ms. Sargent alleges in *Sargent II* occurred before or concurrent with the events in *Sargent I*. In other words, this is not a situation where Ms. Sargent could not have brought the claims alleged in *Sargent II* earlier because they occurred after *Sargent I* was filed. *See, e.g.*, *Hobbs v. Dart*, No. 20 C 6513, 2021 U.S. Dist. LEXIS 90641, at *11 (N.D. Ill. May 12, 2021) (denying motion to dismiss based on claim splitting because the events at issue in the second case did not occur until August 1, 2019, well after November 2017, when the first case was filed and it would have been "extremely difficult" to amend the first complaint). Moreover, it is of no matter that the events in *Sargent II* (January 2019) began earlier than the events alleged in *Sargent I* (April 2019) as the time frames need not line up exactly. *Cf. Sutcliffe Storage*, 162 F.2d at 852-53 (concluding that a plaintiff improperly split claims by filing three different cases involving three successive years of leases of the same property).

Ms. Sargent contends that "[a]side from one line of text buried in nearly two thousand pages . . . [she] had very little information about the basis for an FMLA

claim until the deposition stage" of *Sargent I* and "[i]t was only after counsel sat through Plaintiff's deposition, and then learned information the next day from Irina Bachand, that the full extent of NorDx's FMLA violations were realized." *Pl.'s Opp'n* at 4. This argument is unpersuasive. In *Fernandes v. Quarry Hill Assocs., L.P.*, No. 09-11912-JGD, 2010 U.S. Dist. LEXIS 136884 (D. Mass. Dec. 28, 2010), the plaintiffs similarly asserted that "they should not be precluded from pursuing their federal claims for overtime pay because those claims were not in existence at the time they filed their complaint." *Id.* at *30. The district court for the District of Massachusetts rejected this argument because all the facts that the plaintiff needed to establish her claim occurred before the first suit was commenced. *Id.* The district court noted that "as illustrated by the claims and allegations set forth in [the first] complaint, the plaintiffs were fully aware of the fact that they had not been paid [for the work they performed]" as alleged in their subsequent suit. *Id.*

Just as the plaintiffs in *Fernandes* had all the information necessary to bring their additional claims earlier, based on the *Sargent II* Complaint, Ms. Sargent was similarly fully aware of all facts necessary to bring an FMLA claim prior to the depositions in December 2021. This is further supported by Ms. Sargent's own statement that she "did intend to amend [to] add a claim under the FMLA" which is why she decided to ask Ms. Bachand questions regarding the FMLA in the deposition in the first place. *Pl.'s Opp'n* at 3. Furthermore, as emphasized in *Fernandes* and noted earlier, all the facts that Ms. Sargent alleges in *Sargent II* underlying her FMLA claim occurred prior to her filing of *Sargent I*. Finally, Ms. Sargent admits

she was aware, through her own personal knowledge and experience, that she had not been informed of her FMLA rights and responsibilities prior to her 2019 termination. Based on her claims and relevant time periods of the alleged illegal conduct, the Court finds that Ms. Sargent could have alleged her disability discrimination and FMLA claims in the same action, even though she decided not to do so.

Second, both cases involve the same employment relationship between Ms. Sargent and NorDx and both causes of action seek relief for the same wrong (Ms. Sargent's alleged improper termination) albeit on different legal grounds. Importantly, the actors and events in *Sargent I* and *Sargent II* overlap. For example, in *Sargent II*, Ms. Sargent directly references NorDx's efforts to relocate her because of her teeth as part of NorDx's intensified efforts to find grounds for terminating her employment due to her FMLA utilization. This allegation is at the heart of *Sargent I*. Additionally, in both cases Ms. Sargent refers to Ms. Bachand's and Ms. Christie's ultimate decision to terminate her employment as being the same in both cases. Ms. Sargent makes no effort to differentiate her two cases on factual grounds and instead acknowledges that she "pleads [*Sargent II*] in the alternative" to her prior disability discrimination suit. *Sargent II Compl.* ¶ 83.

In sum, the Court concludes that *Sargent I* and *Sargent II* share a common nucleus of operative facts and therefore are sufficiently "identical" theories of action for purposes of the claim-splitting analysis.

**B.    Identicality of the Parties**

In addition to presenting identical causes of action, the parties to *Sargent I* and *Sargent II* must also be sufficiently identical.  Res judicata, as applied in the claim-splitting context, prohibits claim splitting by "parties to an original action and those in privity with such parties."  *Doe v. Urohealth Sys.*, 216 F.3d 157, 161 (1st Cir. 2000).  Generally "a 'party' to litigation is one by or against whom a lawsuit is brought." *Smith v. Bayer Corp.*, 564 U.S. 299, 313 (2011) (cleaned up). "Under the concept of privity, a non-party may be bound by a prior judgment if that party substantially controlled or [is] represented by a party to the original action." *Urohealth Sys.* at 162 (alteration in *Uroheath*) (quoting *Com. Union Ins. Co. v. Pelchat*, 727 A.2d 676, 680 (R.I. 1999)).  To determine two parties' privity, "courts often look to the commonality of their interest in the matter" and whether "the companies are parent and wholly owned subsidiary."  *Id.*   However, a parent-subsidiary relationship does not automatically establish privity.  *Id.*  Here, the Court considers whether MaineHealth and NorDx are the same party or are in privity with one another.

In *Doe v. Urohealth Systems*, the First Circuit reversed the district court and concluded that a subsidiary and its parent company were in privity with one another for the purposes of the res judicata analysis.  *Id.*  The case involved a company that designed and manufactured medical equipment, Dacomed, which was later acquired by Urohealth, which subsequently manufactured and sold the medical products after the acquisition.  *Id.* at 159.  The First Circuit concluded that Dacomed and Urohealth were in privity because Urohealth took legal responsibility for Dacomed products and actions, the parties shared an identical interest, and Dacomed was a wholly owned

subsidiary of Urohealth. *Id.* at 161-62. Other courts have also noted commonality of counsel representing the two parties as suggestive of privity. *See Sterling Equip., Inc. v. Gibson*, No. 18-11230-RGS, 2019 U.S. Dist. LEXIS 111084, at *5 n.7 (D. Mass. July 3, 2019).

Applying this framework, the Court concludes that NorDx and MaineHealth are in privity and are thus the "same" party for purposes of this claim-splitting analysis. First, NorDx is a wholly owned subsidiary of MaineHealth, as Ms. Sargent alleges in her *Sargent II* Complaint. *Sargent II Compl.* ¶ 6. Beyond a mere "parent-subsidiary" relationship, Ms. Sargent claims that "MaineHealth and NorDx were an integrated enterprise and/or joint employer of [Ms. Sargent], because MaineHealth and NorDx shared common management, ownership, direction and control, administration of employee benefits, operations, employee health services, labor counsel, and human resources." *Id.* ¶ 9. Ms. Sargent also alleges that the same employee, Ms. Christie, who she says decided to terminate her in *Sargent I*, made the same decision in *Sargent II*. *Compare Sargent I Compl.* ¶ 17-18; *with Sargent II Compl.* ¶ 78. Thus, there was substantial overlap between MaineHealth and NorDx as demonstrated by the complex network of overlapping management and administration and by Ms. Sargent's account of the facts in both cases.

Second, because their supervisory and management structures are interconnected, NorDx and MaineHealth share identical interests in resolving the employment dispute with Ms. Sargent, especially as her allegations are based on the same underlying circumstances, as discussed above. NorDx and MaineHealth's

shared interest is further evidenced by the fact that both defendants are represented by the same counsel. Moreover, there is nothing on the record that would suggest that NorDx and MaineHealth have separate property holdings, or other differentiating attributes that would overcome their identical interests, identical boards of directors, and identical legal counsel. *See Hartsel*, 296 F.3d at 987.

### C.   Equitable Principles

Having concluded that the parties and claims in *Sargent I* and *Sargent II* are identical, the Court next considers equitable factors including (1) the impact, if any, of *Sargent II*'s status as a class action; and (2) the appropriate remedy.

#### 1.   *Sargent II*'s Status as a Class Action

First, the Court must determine whether Ms. Sargent's status as a class representative in *Sargent II* renders her a separate "party" for the purposes of the claim-splitting analysis or renders the claim-splitting doctrine inapplicable. Ms. Sargent argues that because *Sargent II* could involve tens of thousands of employees, it is distinguishable from cases cited by MaineHealth outside of the class action context. *Pl.'s Opp'n* at 12-13.

On this issue, some courts note that class actions are "exceptions" to the rule against claim splitting in certain circumstances, although the parameters of this exception remain unclear. *See, e.g.*, *Gooch v. Life Invs. Ins. Co. of Am.*, 672 F.3d 402, 428 n.16 (6th Cir. 2012) (holding that a class action presents a recognized exception to the claim-splitting doctrine in circumstances where a putative class member later seeks, for example, to pursue a damages claim that could not be advanced in the prior action or was expressly excluded from the class action); *Hebert v. MudTech Servs.*,

No. 15cv0933, 2015 U.S. Dist. LEXIS 128164, at *13 (W.D. Pa. Sept. 23, 2015) ("[W]hether the doctrine of claim splitting applies to class actions appears to be an unsettled area of law").

However, the Court need not address whether this area of law is or is not settled, and, if settled, its parameters, based on the procedural posture of this case. The class action exception to the claim-splitting doctrine typically arises when a party bringing a lawsuit is already involved in a pending or resolved class action, in other words, when the class action is the first lawsuit to be filed and where the party opposing a claim-splitting defense is not the named representative of that class action. *See, e.g.*, *Woodards v. Chipotle Mexican Grill, Inc.*, No. 14-4181 (SRN/SER), 2015 U.S. Dist. LEXIS 69606, at *2, 5-6 (D. Minn. Apr. 3, 2015) (involving a defendant seeking to dismiss a class action lawsuit where the named plaintiff was involved in a prior class action lawsuit, but not as the named representative); *Greene v. H&R Block E. Enters., Inc.*, No. 10-21663-CV-KING, 727 F. Supp. 2d 1363, 1367-68 (S.D. Fla. 2010) (granting dismissal where the class action at issue was brought subsequent to a prior class action, which plaintiff had consented to join, brought by the same attorneys, seeking the same relief, and based on the same factual scenario but alleging a different cause of action).

In *Hebert v. MudTech Services*, 2015 U.S. Dist. LEXIS 128164, the court dismissed without prejudice a suit naming the plaintiff as the lead representative in a class action while he remained a party-plaintiff member in a second class action suit involving the same underlying facts. *Id.* at *15-16. The *Hebert* Court recognized

that generally, class actions are an exception to the claim-splitting doctrine but concluded that the plaintiff was "actively participating as a plaintiff in two cases" involving attempts to "obtain overtime pay from his former employer." *Id.* at *15. The district court concluded that such a "blatant example of claim splitting" was appropriately resolved under the "traditional *Stark* analysis" rather than a "class adequacy" analysis. *Id.* at *15; *see also Stark v. Starr*, 94 U.S. 477, 485 (1876) (A plaintiff is "not at liberty to split up his demand and prosecute it by piecemeal, or present only a portion of the grounds upon which special relief is sought, and leave the rest to be presented in a second suit, if the first fail").

In this case, Ms. Sargent's individual cause of action was filed first, followed by the class action lawsuit. Moreover, Ms. Sargent is the named plaintiff in the class action, not an unnamed party who merely signed on. The Court therefore does not need to wait for resolution of class certification to determine whether Ms. Sargent is a "party" for the purposes of the class-action litigation. Because Ms. Sargent is the named representative of the class action, she is a party to *Sargent II. Meridia Prods. Liab. Litig. v. Abbott Lab'ys*, 447 F.3d 861, 869 (6th Cir. 2006) ("Courts have held that summary adjudication prior to class certification binds only the named plaintiffs"); *cf. Bowles v. Leprino Foods Co.*, No. 1:19-cv-00635-AWI-BAM, 2020 U.S. Dist. LEXIS 105114, at *10-11 (E.D. Cal. June 16, 2020) (deferring final resolution of a motion to dismiss for claim splitting where the first class action lawsuit had not yet been certified and it was thus unclear whether the plaintiff in the second action (who was not a named plaintiff in the first) was a "party" to the prior lawsuit for the purposes

of the claim-splitting doctrine); *Waldron v. George Weston Bakeries Distrib.*, 477 F. Supp. 2d 295, 297-98 (D. Me. 2007) (stating that there was "no question with respect to the third element" (identicality of the parties) because the plaintiffs in the second suit were named plaintiffs in the first suit, which was a class action).

Just as the *Hebert* Court characterized a plaintiff as "actively pursuing [a] matter as the lead representative on behalf of a putative class" while a "party-plaintiff member of a class in [separate] litigation" as a "blatant example of claim splitting," *Hebert*, 2015 U.S. Dist. LEXIS 128164, at *15, the Court concludes that Ms. Sargent is pursuing two separate cases in both *Sargent I* and *Sargent II*, both individually and as a named representative.  This is further supported by *Sargent II's* recitation of the facts underlying both cases which, as discussed above, the Court concluded share a common nucleus of operative facts.  Ms. Sargent is therefore not shielded by her representative status in this class action lawsuit.

Finally, the Court agrees with MaineHealth that "[t]he question is not whether the 'thousands' of unnamed putative class members have split their claims, but whether the named plaintiff has." *Def.'s Reply* at 4.  Claim splitting and res judicata require a party-by-party analysis and in this case, it is Ms. Sargent's claims at issue, not those of the other unnamed plaintiffs, who are, for the purposes of claim splitting and res judicata, not yet plaintiffs. *See Sparks v. Children's Place*, No. 17-1057, 2017 U.S. Dist. LEXIS 173896, at *4 (E.D. Pa. Oct. 19, 2017) ("Of course, the fact that other potential class members are not splitting their claims, however, does not change the fact that the Named Plaintiffs are").  A contrary conclusion would be inapposite, as it

would allow parties to bypass equitable principles of claim splitting by filing class action lawsuits. Furthermore, this conclusion "does not bar other avenues of recovery. . .. Plaintiffs will therefore retain the ability to pursue individual action if they are so inclined, so long as any action complies with procedural safeguards and limitations." *Greene*, 727 F. Supp. 2d at 1368; *see also Wright v. Schock*, 742 F.2d 541, 544 (9th Cir. 1984) ("[D]efendants have prevailed only against the named plaintiffs. The judgment will not be res judicata as to other individual plaintiffs or other members of any class that may be certified. These individuals or class members remain free to assert any claims they may have against the . . . defendants"). Thus, to the extent that other potential members of the employee class wish to pursue the FMLA claim, they are not prohibited from doing so. However, Ms. Sargent may not pursue two separate cases that share a common nucleus of facts.

### 2. The Remedy

Now that the Court has determined that Ms. Sargent improperly split her claims, it must decide what to do with *Sargent I* and *Sargent II*. "When claim splitting occurs, 'a court may stay the second suit, dismiss it without prejudice, enjoin the parties from proceeding with it, or consolidate the two actions.'" *Perry*, 2017 U.S. Dist. LEXIS 112019, at *8 (quoting *Coleman v. B.G. Sulzle, Inc.*, 402 F. Supp. 2d 403, 421 (N.D.N.Y. 2005) (internal quotation marks omitted)).

MaineHealth argues that consolidation would be inappropriate and that dismissal without prejudice would be the most prejudicial result because it would allow Ms. Sargent to refile her claim in state court. *Def.'s Reply* at 7. Alternatively, Ms. Sargent urges the Court to continue the stay of *Sargent I* and allow *Sargent II* to

proceed with discovery because it "presents a far broader and more complex piece of litigation." *Pl.'s Opp'n* at 5-6.

First, the Court agrees that consolidation would be inappropriate here because it would allow Ms. Sargent to bring her *Sargent II* Complaint without having to seek leave to amend, which would be inconsistent with Federal Rules of Civil Procedure 15 and 16. It would further give Ms. Sargent an end-run around the Court's scheduling order. *See Geary v. Stanley*, 2007 ME 133, ¶ 16, 931 A.2d 1064 (affirming the trial court's judgment because it "could have reasonably concluded that allowing [plaintiff] to proceed with the second action would enable her to circumvent the pretrial order and procedural rules").

Second, the Court is not convinced by Ms. Sargent's argument that staying *Sargent I* would be the best course of action. Although "absent a statute or rule to the contrary, federal district courts possess the inherent power to stay pending litigation when the efficacious management of court dockets reasonably requires such intervention[,] . . . stays cannot be cavalierly dispensed: there must be good cause for their issuance; they must be reasonable in duration; and the court must ensure that competing equities are weighed and balanced." *Marquis v. Fed. Deposit. Ins. Corp.*, 965 F.2d 1148, 1154-55 (1st Cir. 1992)). Ms. Sargent's argument that *Sargent II* should proceed, and *Sargent I* should be stayed because *Sargent II* is broader in scope as a class action lawsuit does not rise to the level of "good cause." Ms. Sargent has not persuasively argued why the Court should stay *Sargent I* instead of *Sargent II*, nor has she cited any caselaw supporting this contention. Moreover, staying *Sargent*

*I* would allow Ms. Sargent to circumvent her strategic choices in that suit, contrary to First Circuit principles. *See Hatch*, 699 F.3d at 45 ("It is axiomatic that claim preclusion doctrine [and claim splitting] requires a party to live with its strategic choices" (alterations and internal quotation marks omitted)).

Moreover, Ms. Sargent's argument that *Sargent I* should be stayed instead of *Sargent II* is unpersuasive given that *Sargent I* was the first case to be filed in this court, has been pending since December 15, 2020, and discovery is substantially complete.[8] Ms. Sargent's justification that she would have met the Rule 16(b) "good cause" standard for amending her Complaint in *Sargent I* is immaterial as such a motion is not currently before the Court, and Ms. Sargent has not cited caselaw to support a conclusion that "good cause" to amend may be used to rebut a claim-splitting defense. Finally, "one of the principal purposes of the rule against claim splitting is 'to protect[] the defendant from the necessity of litigating similar claims in separate actions." *Fernandes*, 2010 U.S. Dist. LEXIS 136884, at *33-34 (internal quotation marks omitted). Staying *Sargent II* would still subject MaineHealth "to the costs and uncertainties associated with multiple lawsuits." *Id.* at *34. Moreover, as previously discussed, there is no need to stay either case pending class certification because Ms. Sargent is a named plaintiff in the class action; her party status does not hinge on certification. The Court therefore declines to stay *Sargent I* beyond the resolution of this motion.

---

[8]    As mentioned previously, the discovery deadline for *Sargent I* was January 10, 2022, which Ms. Sargent sought to extend. *Sargent I, Pl.'s Mot. to Amend Scheduled Order* (ECF No. 14). Regardless of the outcome of Ms. Sargent's motion to amend, several depositions have already been completed and documents exchanged in *Sargent I.*

The Court similarly declines to stay *Sargent II* pending resolution of *Sargent I*. Such a stay would be inapposite with the articulated claim-splitting principles, which courts developed in order to avoid having to stay a case pending the final judgment in a prior case.

Ultimately, the Court concludes that dismissal of *Sargent II* without prejudice is the more equitable solution. Such an outcome is consistent with equitable principles designed to avoid unnecessarily burdening the defendant, while still enabling Ms. Sargent to litigate her FMLA claim by filing a motion for leave to amend her *Sargent I* Complaint.[9] Nor does this outcome prejudice other potential members of the class action. As discussed above, this order in no way restricts other potential members of the putative class from bringing their own claims against NorDx and/or MaineHealth for FMLA retaliation. *See Greene*, 727 F. Supp.2d at 1368. Although NorDx is concerned about Ms. Sargent reinitiating the second lawsuit in state court, the Court concludes that if that were to happen, the state court, not this Court, should determine whether Ms. Sargent should be allowed to proceed in state court. Finally, the Court is concerned about the potentially overlapping impact of the dismissal with prejudice of the second lawsuit and what impact, if any, a with prejudice dismissal should have on the first lawsuit. In the Court's view, the first lawsuit should proceed on its own merits.

---

[9] Although Ms. Sargent incorporates arguments on the "good cause" standard for a motion to amend, such a motion is not before the Court. Ms. Sargent is free to file a motion for leave to amend her complaint in *Sargent I*, but the Court does not speak to the success of such a motion at this time.

## VI.    CONCLUSION

The Court GRANTS MaineHealth's Motion for Judgment on the Pleadings, No. 2:22-cv-00006-JAW (ECF No. 6), and DISMISSES without prejudice Monique Sargent's Complaint in *Sargent II*, No. 2:22-cv-00006-JAW (ECF No. 1).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 14th day of June, 2022